339 So.2d 458 (1976)
Thelma LEONARD et al.
v.
ALBANY MACHINE AND SUPPLY COMPANY et al.
James FISHER et al.
v.
ALBANY MACHINE AND SUPPLY COMPANY et al.
Nos. 10849, 10850.
Court of Appeal of Louisiana, First Circuit.
September 20, 1976.
Rehearing Denied November 15, 1976.
Writ Refused January 19, 1977.
*459 Ronald F. Plaisance and Nicholas A. Danna, Jr., New Orleans, for plaintiffs-appellants.
Walter M. Babst, Metairie, for defendants-appellants Albany Machine & Supply Co. and Hartford Insurance Group.
Edwin C. Schilling, Jr., Amite, for defendant-appellee Wilco Machine Works, Inc.
Charles W. Franklin, Baton Rouge, for defendant-appellee Nichols Construction Corp.
Before SARTAIN, BLANCHE and LOTTINGER, JJ.
BLANCHE, Judge.
The plaintiffs, Thelma Leonard, et al., and James Fisher, et al., and also the defendant, Albany Machine and Supply Company, appeal the judgment of the trial court in this products liability case. The plaintiffs appeal the dismissal of their suit against defendants, Nichols Construction Corporation and Wilco Machine Works, Inc., and seek an increase in the quantum awarded by the trial court. Albany appeals the trial court's finding of liability against them. We reverse the judgment against Albany and affirm the dismissal of Nichols and Wilco. Separate judgments will be rendered.
On September 26, 1966, James Fisher instituted the suit which is the subject matter of Appeal No. 10,850 (trial court Suit No. 4431) against Albany, Terrebonne Lumber and Supply Company, Inc., and several of its supervisory employees; Wilco, Nichols and various other defendants. Therein he sought to recover damages for personal injuries sustained in an accident on September 29, 1965, in the course of his employment by Terrebonne, while working near a machine known as an Albany Trimmer 20-foot Model No. 40WA saw, Serial No. 214. The trimmer was manufactured by Albany, sold by Wilco, and installed by Nichols. Fisher was struck by a piece of lumber ejected from the device.
Subsequent to the institution of suit, Fisher died and his wife and children were substituted as parties to the action.
On June 14, 1967, Fisher's widow, Thelma Leonard, individually, and as natural tutrix of her minor children, Beverly Ann Fisher, Erma Dean Fisher, James Worthy Fisher, Jr., and Keith Fisher, instituted the suit which is the subject matter of Appeal No. 10,849 (trial court Suit No. 4608) to recover for Fisher's alleged wrongful death. Recovery was sought against the same defendants that were named in the first suit.
The survival and wrongful death actions were consolidated for trial, and various procedural *460 aspects of the litigation have been reported at La.App., 246 So.2d 218; La.App., 246 So.2d 230; and 261 La. 747, 260 So.2d 691.
After many procedural delays, trial was had on the merits in December, 1972, and resulted in judgment on November 8, 1973, in favor of plaintiff, Thelma Leonard Fisher, as duly qualified natural tutrix of her minor children in the sum of $25,000 for each child, or a total of $100,000 for the four minor children. There was further judgment in favor of plaintiff, Thelma Leonard Fisher, individually, in the sum of $37,765 for loss of earnings and other special damages and an additional $35,000 for the general damages sustained by both the plaintiff, Thelma Leonard Fisher, and the decedent, totaling $72,765. The total award of $172,765 was to bear legal interest at the rate of 5 percent from the date of judicial demand until paid.
Cast in judgment, jointly, severally, and in solido, were Albany and their insurer, Hartford Insurance Group, and T. B. Lawrason, Jr., the manager of Terrebonne's sawmill at the time of the accident, and his insurer, New Amsterdam Casualty Company. The liability of Hartford was limited by its policy to the sum of $100,000.
The judgment debtors were cast for all costs, plus expert witness fees in the sum of $400. New Amsterdam was given credit for $12,463.75 for workmen's compensation benefits previously paid.
Wilco and Nichols were dismissed from the suit, as were the remainder of the defendants.
Subsequent to the rendition of judgment, the plaintiffs settled the portion of the judgment against Lawrason and New Amsterdam, and the only issues presented on appeal by plaintiffs are the dismissal of Nichols and Wilco and the quantum awarded by the trial court. Our reversal of the judgment against Albany disposes of these issues.
In 1966, Terrebonne decided to increase the capacity of its lumber mill at Pine Grove, Louisiana. In conjunction therewith, an engineer, Mark Howard, was hired to design an addition to the mill, utilizing as much of the existing facility as practicable.
Because of the projected increase in capacity, a new trimmer was required and ultimately purchased from Albany through its commissioned sales representative, Wilco.
The trimmer was approximately twenty-two feet long, with a stationary or "zero-saw" at one end, and additional saws at two-foot intervals up to twenty feet. Its function, as one of the last components in the lumber processing line, was to trim the already-processed green lumber into commercial lengths of two, four, six, eight, et cetera, feet.
This particular trimmer was automatic, and, for example, if an eleven-foot board came down the conveyor line, small pins would be activated so that the zero blade and the ten-foot blade would automatically trim it to ten feet. Additionally, the operator of the trimmer could cause the middle blades to descend and remove unuseable sections from the center of the board.
The trimmed lumber would pass through the saw on a chain conveyor belt, and after being trimmed, it was deposited onto another conveyor which carried it to the drying areas. The small pieces cut from both ends of the board would be separated from the good lumber and disposed of.
The conveyor that brought the lumber to the trimmer and the one that carried it away were both part of the pre-existing physical plant. The Albany trimmer was simply inserted into the line-up in place of the old trimmer, with its long axis in a north-south direction.
The decedent's job was to stand at the south end of the trimmer and prevent the trimmed lumber from jamming up on the conveyor. There was also some evidence to the effect that he was to grade the trimmed pieces and set aside those that required resawing.
Nevertheless, his duties required him to occasionally go onto the ten-foot wide conveyor table on the finished or downstream *461 side of the trimmer to straighten any lumber he could not reach from his position with a six-foot metal hook. Because of the mill process, he could not deactivate the trimmer, since lumber would continue to flow downstream and cause a jam-up on the front side of the saw. Therefore, when he went onto the table on the downstream side, the blades usually continued turning and sawing fresh lumber.
The evidence reveals that on the day the trimmer was put into operation, T. B. Lawrason, Jr., the mill manager, was notified that the trimmer was forceably throwing the cut-off pieces downstream or in the direction of the table where the decedent was required to work. To remedy the problem, he ordered the construction of a three-foot high, wooden baffle which was hung in a vertical position along the entire length of the trimmer at a point between the blades and the table where the decedent worked. The purpose of the baffle was to shield the workers in the immediate downstream area from the flying cut-offs.
After the installation of the shield, Lawrason thought the problem was cured and ordered resumption of operations. However, on about the third day of operations, the decedent was struck on the right forehead by a piece of cut-off lumber while returning from the table to his position at the south end of the saw. The evidence is inconclusive as to which blade threw the cut-off. Fisher died approximately sixteen months later as a result of his injuries.
The evidence establishes that the original three-foot high shield was inadequate, because when it was increased to four feet, immediately after the accident, the risk of injury to the worker on the table was virtually eliminated.
The plaintiffs recovered against Lawrason based upon the breach of his supervisory duties owed to the decedent.
At the trial the plaintiffs failed to establish that the decedent was injured as the result of a malfunction of the trimmer. Nevertheless, the trial judge granted them recovery against Albany based upon a defect in the design of the trimmer, that is, the failure to shield the blades, thereby causing an unreasonably dangerous risk that a workman such as decedent would be injured by flying cut-offs.
We conclude that it was error to hold that the trimmer was defectively designed.
The only evidence offered by the plaintiffs to prove a defect in design was the testimony of their expert witness, Fred Ackis, an associate professor and chairman of the Department of Industrial Safety at Delgado Junior College, who, admittedly, had never worked in a sawmill or designed one.
He concluded that the trimmer was a dangerous machine and was of the opinion that it should not be operated at all. However, his only recommendation for a safer design was the installation of guards similar to those used on hand-held skill saws, over each blade.
Albany countered with the expert testimony of Rene Fritz, Sr., the president of the defendant company, who had spent his entire working life operating and designing sawmill equipment.
His testimony established that all circular saws such as the instant trimmer throw cut-offs. However, he contended that the skill saw guard advocated by the plaintiff's expert would be useless on such trimmers since those guards are designed to protect fingers and not to prevent the throwing of cut-offs. He also pointed out that the tremendous speed at which the trimmer blade rotates "approximately 1,800 revolutions per minute" makes it more prone than a skill saw to throw pieces of lumber. The high speed, however, is required to meet the capacity of today's commercial sawmills.
Fritz related that Albany, since its inception in 1947, had sold approximately fifty to seventy-five trimmers of the type herein. The company had also completely designed eight to ten sawmills in which similar trimmers had been utilized. However, no shield was ever sold as a component part of any trimmer manufactured by Albany.
*462 His company would design a shield for the trimmer only when it was responsible for designing the entire sawmill; but, even then, the actual construction and installation of the shield was done by the contractor. In such cases the shield was not a component part of the trimmer itself, but was separately designed and installed to meet the requirements of the particular mill. In all other cases, that is, where the company did not design the mill and merely sold the trimmer to be installed as a component part thereof, the shielding was left to the purchasers.
Fritz's testimony established that sawmills are arranged in sequence, and machines such as the instant trimmer are merely component parts of the production line-up. The sequnence, of course, varies from mill to mill. Accordingly, the method of protecting or shielding workmen from flying cut-offs is different for each mill. Therefore, it would be relatively impossible to include, as a component part of the trimmer a shield which would meet the criteria of every purchaser. The sequence and capacity of the mill, the position of the workmen, the space available and even the type of lumber to be produced are all factors which must be considered when designing the shield. Fritz never argued that the trimmer should not be shielded. His only contention was that the shield is the responsibility of the person who designs the mill.
To illustrate the complexities involved in the design and placement of trimmer shields, we note that the trimmer which was replaced by the Albany model required no shielding at all. That trimmer, since it was an undercut saw, that is, the blades were raised rather than lowered to cut the boards, threw cut-offs upstream or in the opposite direction from the decedent. Consequently, there was no requirement to shield the decedent from injury. By contrast, the Albany trimmer, being an overcut saw, threw cut-offs downstream in the direction of the decedent.
Although Howard, the engineer who designed the addition to the instant mill, requested Albany to make several small adjustments in the size of the trimmer, Albany was never consulted with regard to the design of the mill; nor was Albany requested to advise Howard concerning the shield requirements of the trimmer. Since Albany was unaware of the mill design, it would have been useless for it to attempt to design a shield for the trimmer.
On appeal there has been no contention that the instant trimmer did not throw the cut-off which struck the decedent. Therefore, since Albany designed and sold said trimmer, its conduct was a substantial factor or cause in fact of the accident. Shelton v. Aetna Casualty & Surety Company, La., 334 So.2d 406; Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962).
However, a finding that Albany's conduct was a cause in fact of the decedent's injury does not, without more, establish liability. Additionally, Albany must have breached a legal duty imposed to protect the decedent against the particular risk that occurred. The particular risk herein was the danger of being struck by cut-offs ejected by the trimmer. The question on appeal is, therefore, did Albany have a duty to protect against that risk; and, if so, did it breach that duty.
In cases where, as herein, no statutory duty exists, courts may impose duties upon manufacturers to protect the well-being of persons who use their products in this state. The general jurisprudential rule is that a manufacturer owes all reasonably foreseeable users of its product a duty to adequately design and manufacture that product. Bowen v. Western Auto Supply Company, 273 So.2d 546 (La.App. 1st Cir. 1973); Gauthier v. Sperry Rand, Inc., 252 So.2d 129 (La.App. 3rd Cir. 1971), writ refused, 259 La. 940, 253 So.2d 382 (1971).
Accordingly, the plaintiffs urge this court to impose a duty upon Albany to protect the decedent against the risk that occurred. We find, however, that the burden to properly shield the subject trimmer was not the responsibility of Albany in the instant case.
*463 The custom of the industry, although not conclusive, may be considered when determining the duties owed by a manufacturer for its product. Leathem v. Moore, 265 So.2d 270 (La.App. 1st Cir. 1972). In the instant case, the unrebutted testimony of Albany's expert, Fritz, established that the custom in this industry is to shield the trimmer by various methods after it is installed into the mill assembly line. In fact, no trimmer manufactured in the United States comes equipped with a shield. His testimony also established that it is always the designer of the mill who provides shielding for the workmen, based upon the physical lay-out of the plant. As we have previously noted, Albany had nothing whatsoever to do with the design of the instant sawmill.
The purchaser and decedent were both aware of the custom to supply trimmers without shielding, and, upon discovering that the subject trimmer was throwing cut-offs in decedent's direction, a shield was constructed at the site without even consulting or questioning Albany. Furthermore, at the time of its installation, Albany's obligation to shield the trimmer was never raised, and there is no evidence in the record to indicate that Albany was charged back for the expense of constructing and erecting said shield.
We have carefully considered the evidence in light of the danger involved and the unique nature of the product as a component part of the sawmill production line; and we conclude that the custom of the industry to shield the trimmer by on-site construction is more reasonable than to attempt to design a trimmer component part to protect against all contingencies.
We, therefore, reject plaintiff's argument that Albany owed a duty to the decedent to provide a shield on the trimmer it sold to Terrebonne.
We also reject plaintiff's contention that Albany owed a duty to warn the decedent of the danger. Where the risk is obvious, there is no duty to warn or protect against it. Albert v. J & L Engineering Company, 214 So.2d 212 (La.App. 4th Cir. 1968).
The risk was obvious herein, as both the purchasers and users of the Albany trimmer knew of its propensity to throw cut-offs. In fact, before putting the trimmer into operation, the purchasers built a protective cage around the operator of the saw some twenty-feet upstream from the trimmer. Tragically, however, the design of the mill failed to include similar protection for the decedent on the downstream side. Albany, of course, was not responsible for the design failure.
In view of the evidence presented in this case, we find that Albany breached no duty to the decedent, and, consequently, the finding of liability against it by the trial court must be reversed.
Due to our reversal of the finding of liability on the part of Albany, the remaining issues on appeal, that is, the questions of liability of Nichols and Wilco, in quantum, are now moot.

ORDER IN NO. 10,849
For the above and foregoing reasons, the judgment of the trial court in Appeal No. 10,849 which found Albany Machine and Supply Company liable to the plaintiffs for defects in the design of its trimmer is hereby reversed. The dismissal of the plaintiffs' suits against Nichols Construction Corporation and Wilco Machine Works is affirmed. All costs are to be paid by plaintiffs.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.

ORDER IN NO. 10,850
For the reasons set forth above, the judgment which found Albany Machine and Supply Company liable to the plaintiffs for defects in the design of its trimmer is hereby reversed. The dismissal of the plaintiffs' suits against Nichols Construction Corporation and Wilco Machine Works is affirmed. All costs are to be paid by plaintiffs.
*464 REVERSED IN PART, AFFIRMED IN PART AND RENDERED.