408 So.2d 315 (1981)
Joe POTMESIL, Plaintiff-Appellee,
v.
E. I. DuPONT deNEMOURS CO., INC., et al., Defendants-Appellants.
No. 8487.
Court of Appeal of Louisiana, Third Circuit.
December 16, 1981.
Rehearing Denied January 29, 1982.
Writ Denied March 19, 1982.
Cook, Clark, Egan, Yancey and King, Sidney E. Cook, Shreveport, for defendants-appellants.
Brittain & Williams, Joe Payne Williams, Natchitoches, for plaintiff-appellee.
Gahagan & Gahagan, Fred S. Gahagan, Natchitoches, for defendant-appellee.
Before CULPEPPER, CUTRER and STOKER, JJ.
CUTRER, Judge.
This appeal arises out of a suit for damages sustained by Joe Potmesil to his soybean crop as a result of his use of a chemical herbicide manufactured by E. I. DuPont deNemours Co., Inc.
Joe Potmesil (Potmesil) produced soybeans from a large farm in Natchitoches Parish. He used chemical herbicides to control the grass and weeds in his bean crop. Potmesil purchased his chemicals from E. I. Dupont deNemours Co., Inc. (DuPont) through its distributor, Paul Wall, in Mansura, Louisiana.
During the crop year of 1978, Potmesil had planted 1200 acres of soybeans. On May 11, 1978, he was spraying the fields with a powdered herbicide called Lexone. This form of powdered Lexone was mixed with water and sprayed by aerial application. The aerial application service was rendered by Foshee Dusting Co., Inc. (Foshee). *316 Around noon that day, Potmesil ran out of powdered Lexone. He acquired more Lexone from the Dupont distributor, Wall. Wall had no powdered Lexone but sent Potmesil some liquid Lexone, a new product. Potmesil obtained 125 gallons of liquid Lexone (50 containers with 2½ gallons each). Potmesil applied the liquid to a portion of the 315.5 acres in question. Approximately one week later, Potmesil sprayed the remainder of the acreage in question with the liquid Lexone. Around June 6, 1978, Potmesil noticed that some of his beans were dying or were stunted in growth. The affected area was 315.5 acres which was sprayed with the liquid Lexone.
Potmesil then undertook operations to replant the damaged areas of the 315.5 acres. Even though he replanted same, his yield for this acreage was substantially lower than the beans on adjoining lands which were sprayed with the powdered Lexone.
Potmesil filed suit for damages for his losses on the 315.5 acres. The suit was filed against DuPont and Foshee's alleged insurer, Global Aviation Insurance Company (Global). A default judgment was rendered against Global.[1] Potmesil's petition was then amended by making Foshee a party defendant. After trial on the merits, judgment was rendered in favor of Potmesil and against Dupont in the amount of $42,607.36. The judgment dismissed the suit against Foshee. Dupont appealed. Potmesil answered the appeal seeking attorney's fees.
The issues on appeal are as follows:
(1) Whether Dupont is liable for damages under the circumstances presented;
(2) If such liability exists, whether the damages are excessive; and
(3) Whether attorney's fees should be awarded.

WHETHER DUPONT IS LIABLE FOR DAMAGES
At the outset, we must observe that there is no contention that the liquid Lexone is defective. Potmesil stated that liquid Lexone is an "excellent" product and he has used it since the incident in question by using the recommended amount of liquid per acre, one pint.
The question presented is whether the labels on the liquid containers met the requirements of the law to properly warn the user of the effects of the misuse of the Lexone and/or whether they contained the proper instructions for the use of same.
The facts presented in this case are:
Potmesil, 44 years of age, had been a farmer all of his adult life. He had finished high school and three semesters of college. He owned large farms in Avoyelles and Natchitoches parishes. He farmed principally soybeans. Potmesil testified that he had been using chemicals for approximately eight years before the incident in question. The chemicals were used for weed and grass control in the soybeans. He had used such chemicals or herbicides as Lasso, Lorox, Sencor, Treflan, Lexone and others. It depended upon the type of land as to which chemical or combination of chemicals he would use on a certain area. He explained that he used Lasso, Lorox and Treflan on sandy loam. He had used Sencor, Treflan and powdered Lexone on heavier clay soils. He stated that Sencor or powdered Lexone would kill broadleaf weeds while Treflan was used for grass control.
Potmesil testified that he had used Sencor along with Treflan up until the powdered Lexone became available. The Sencor was a powder form and, according to the instructions for the use of Sencor, he successfully used one pound of Sencor per acre. This information was contained on the labels of the sacks containing Sencor. When powdered Lexone later became available, he switched to Lexone. Potmesil stated that when he began using the powdered Lexone, he checked on how to use it and, after finding out that powdered Lexone was about the same as Sencor, he used the same formula on the powdered Lexone as he had previously used on the Sencor. Potmesil testified that each of the sacks of *317 powdered Lexone contained the directions for the use of the Lexone on the various types of soil. He checked same and determined that the ratio of powdered Lexone was the same as that of Sencor. The directions contained on the back of the powdered Lexone sacks are in evidence. The directions set forth a table as follows:

"
 Rate per Acre
Soil Texture ... "Lexone" (1bs.) + "Treflan" (Pts.)
Loamy sand, sandy loam ½ + 1
Loam, silt loam, silt, sandy clay,
sandy clay loam ¾ + 1½
Silty clay, silty clay loam, clay, clay loam 1 + 2

Potmesil stated that the type of land contained in the 315.5 acre damaged area was mixed (sandy and clay to clay).[2] He classified it as heavy land. Applying the recommendations contained in the table set out above, one pound of Lexone per acre is recommended for application to "silty clay, silty clay loam, clay, clay loam." These classifications of soil would include the general types of soil on Potmesil's 315.5 acres. Potmesil stated that he applied one and one-fourth pounds of the powdered Lexone per acre and this proved very satisfactory. Potmesil testified that he may vary a little from the manufacturer's recommendations but would not vary enough to cause damage to his crops. He realized that over-application of these herbicides could cause crop damage.
On May 11, 1978, Potmesil was in the process of applying powdered Lexone to his acreage. Around noon he realized that he didn't have enough powdered Lexone to finish the job. He sent Mrs. Potmesil to Mansura to obtain additional powdered Lexone from Paul Wall, the distributor of Dupont products. Upon arrival, Wall informed Mrs. Potmesil that he had no powdered Lexone but that he had some of the new liquid Lexone. She asked for enough to cover 800 acres. Wall sold her 50 bottles of liquid Lexone with each bottle containing two and one-half gallons.
Mrs. Potmesil delivered the Lexone to her husband and Paul Foshee at the grass landing strip on the farm. It was getting late in the afternoon and the weather was heavily overcast. Potmesil stated that he was in a hurry to get the Lexone applied due to the fact that rain was threatening and he needed to get the Lexone out before the rain. Potmesil took one of the containers from the pickup truck and checked the label on the front of the bottle. At the same time he examined the label on the front of the sack of powdered Lexone. The powdered Lexone bag stated on the label that the powder contained 50% "active ingredients." The remaining 50% was "inert ingredients." The label of the liquid Lexone container stated that it contained 42.8% "active ingredients" and 57.2% "inert ingredients." Potmesil, after comparing the labels, noticed that the percentage of active ingredients of each was near the same with the liquid being slightly less than the powdered. *318 Potmesil, being in a hurry, did not check the directions for use on the back of the container. Based upon the similarities of percentage, he decided to apply the liquid at the rate of one pound per acre, as he had been applying the powdered Lexone.
The label on the liquid specifies that the liquid Lexone contains four pounds of "active ingredients" per gallon. In making his determination of the amount of liquid to be used (one pound per acre), Potmesil made a simple error in his assumption. He erroneously used the "4 pounds active ingredients per gallon" as the total weight of a gallon rather than such "4 pounds" being approximately one-half the weight of a gallon.[3] By doing so, Potmesil applied twice as much liquid Lexone per acre as he would have had he been using the powdered form of Lexone. This oversight by Potmesil resulted in the application of one quart (two pints) of liquid Lexone per acre instead of one pint per acre as is specified by Dupont. This over-application caused damage to the soybeans on the 315.5 acres in question.
Potmesil admitted that he did not read the "directions for use," located upon the back of the liquid container. This label sets forth the amount of liquid Lexone to be applied per acre depending upon the type of soil to be treated. This table reads as follows:

"
 Rate per Acre
Soil Texture.... "Lexone" 4L + "Treflan"[4]
Loamy sand, sandy loam ½ + 1
Loam, silt loam, silt, sandy clay,
sandy clay loam ¾ + 1½
Silty clay, silty clay loam, clay loam 1 2

A reading of the table reflects that only one pint per acre of liquid Lexone should be used on the soil contained in the 315.5 acres. Potmesil's testimony in regard to the failure to read the instructions reads as follows:
"Q. All right, sir. So you and Mr. Paul Lee Foshee discussed how much of it to apply and you all agreed on the amount to put out?

"A. Well, looking at the weight of the material and seeing how many gallons it was and comparing it with the powder over there and it threatening to rain and it's fiveit's between four and five o'clock in the evening and we had a whole bunch of more beans to try to fly that evening. And uh ...
"Q. Oh, I see. It was threatening rain out there that afternoon?

"A. That afternoon, yes. And we were kind of in a hurry toit wasn't no thunderstorm bearing down but, you know, it was kind of like it is now, heavily overcast and looked like it would start raining any time. And I'm on a dirt strip. I don't have a blacktop strip. And once it starts raining he has to come on out.

*319 "Q. Oh, I see. You all were in a hurry to get this product out, get it applied?

"A. That's right. And by just looking at these two particular labels, I mean the weight and the active ingredients in it, they're justwell this one here actually shows a little less and I felt like we wasn't in no trouble.

"Q. Did you turn it around to look on the back of it?
"A. No, sir. We didn't bother to go any further than that.
"Q. You didn't bother to look on the back of the label to see if it had any instructions as to how much to put out on an acre of land?

"A. No, sir. Because I felt like these pounds here and the active ingredients was so close to what we were putting out and I just, you know, we just took it for granted from there and went on." (Emphasis added.)
After Potmesil noticed the damage to his beans he called a Dupont representative who went out to the farm for an inspection. After an inspection and discussion with Potmesil, the Dupont representative told Potmesil that he had applied twice as much Lexone as was recommended. Potmesil testified that later he again looked at the labels on the liquid container including the label on the back of the container. By examining the table on the back of the container, he recognized that the table recommended only one pint of liquid per acre, whereas he had erroneously used two pints per acre. Potmesil, with his experience, had no trouble deciphering the table upon his latter examination.[5]
We have gone into this detailed discussion in order to show that, with reasonable care, Potmesil would not have over-applied the liquid herbicide. He was a farmer with reasonable education, and many years of farming experience. He had used chemicals, including herbicides, for eight years in his soybean operations. He had been using Lexone for a time before the accident and was fully aware of the consequences if such a herbicide was not used properly. The tables setting forth the proper distribution rates on particular soils are set forth on the back of both the powdered sack and the liquid container. We have set forth the two tables herein which clearly reflect the recommended amounts to be applied. The powdered label recommends one pound per acre and the liquid recommends one pint per acre. The trial court's conclusion that the labels or instructions are confusing was error. Potmesil, in his testimony, did not contend that he was confused by the directions. He very candidly admitted that he was in a hurry and did not look at the instructions on the back of the container which would have informed him to limit his application to one pint per acre.
The general rules governing such an issue are as follows:
Manufacturers of potentially dangerous products have a duty to warn purchasers of the dangers involved in the use of the product. Hoffoss v. Ralston Purina Co., 341 So.2d 605 (La.App. 2nd Cir. 1977). However, there is no duty to warn of dangers of which a buyer knows or should be aware. Where the consequences of improper usage are such that they are readily cognizable, *320 there is no duty to warn of the particular consequence that may flow therefrom. American Ins. Co. v. Duo Fast Dixie, Inc., 367 So.2d 415 (La.App. 4th Cir. 1979); Foster v. Marshall, 341 So.2d 1354 (La.App. 2nd Cir. 1977), writ den., 343 So.2d 1077 (La. 1977); Leonard v. Albany Mach. & Supply Co., 339 So.2d 458 (La.App. 1st Cir. 1976), writ den., 341 So.2d 419 (La.1976); Dixon v. Gutnecht, 339 So.2d 1285 (La.App. 1st Cir. 1976), writ den., 342 So.2d 673 (La.1976); Albert v. J. & L. Engineering Co., 214 So.2d 212 (La.App. 4th Cir. 1968).
As we apply these principles to the facts herein we conclude that Dupont has complied with the legal obligation to properly label its products. Potmesil was fully aware of the dangers of the over-application of this herbicide. Dupont would be under no duty to warn Potmesil of such danger. The instructions for proper use were clear. Potmesil had no difficulty in making a determination, that he had over-applied the Lexone, once he got around to reading the directions.
The danger of damaging the soybeans was not created by confusion or ambiguity of the label or directions but from Potmesil's neglect to read and apply the clear instructions located on the container. Under these circumstances the judgment of the trial court must be reversed.
Counsel for plaintiff contends that Dupont was under a duty to place a special warning on the label of the liquid Lexone notifying the user that such was "twice as strong" as the powdered Lexone. We disagree with this contention. We cannot conclude that the liquid is "twice as strong" as the powdered Lexone. One pound per acre of the powdered Lexone is recommended for use. One pint per acre of liquid Lexone is recommended for use. One pint of the liquid weighs one pound. (Counsel for Potmesil agreed with this in oral argument.) Therefore, when we compare the two chemicals by weight, the recommended amount of the liquid weighs the same as the recommended amount of the powdered.
The damage caused to the soybeans was not caused by any breach of an obligation by Dupont but by the neglect of Potmesil.
The trial court dismissed the suit against Foshee. There is no contention by Dupont or Potmesil that this was error. The record supports the dismissal of Foshee. Potmesil made the decision as to the application of the herbicide. This portion of the judgment will be affirmed.
For the reasons set forth herein, the judgment of the trial court in favor of Joe Potmesil and against E. I. Dupont deNemours Company, Inc., is reversed, set aside and dismissed. The judgment dismissing Joe Potmesil's suit against Paul Foshee is affirmed. Joe Potmesil is to pay all costs of court both in the trial court and for this appeal.
REVERSED IN PART; AFFIRMED IN PART; RENDERED.
NOTES
[1] This judgment has become final. We do not address this subject any further.
[2] Potmesil testified as follows as to the type of land in the damaged area:

"Q. All right. What type of soil do we have on your property?
MR. BRITTAIN: Which area are we talking about?
"Q. Let's take the so called damaged area.
"A. That's got some kinda mixed land to clay land, but it's all heavy land, referred to as heavy land." * * * * * *
"Q. And you would classify the land on the test plot and the 315 acres as what kind of land?
"A. What kind of land?
"Q. Yes.
"A. Oh, I'd say it's probably anywheres from mixed to sandyI mean not sandy but from mixed to clay land."
[3] His testimony pertaining to the determination of the amount to be used and which reveals his mistake reads as follows:

"... But anyway, the active ingredients are almost identical as that of the powder. The liquid is almost identical to that of the powder. So, that didn't cause us no confusion. And then we said well they looked alike. When we looked at the pounds and saw that each gallon weighed four pounds, well we wanted to put a pound and a quarter. But meanwhile she cautioned us about the price so we may have cut back a little on that thing like I had said before but anyway, we took the four pounds of the liquid per gallon and figured that the one jug would equal to ten pounds....." (Emphasis added.)
[4] Potmesil used Treflan along with the Lexone for weed and grass control.
[5] Potmesil's testimony in this regard reads as follows:

"Q. You have had occasion since all this started to look at the label and look at the back of it I assume?
"A. I check and double check.
"Q. Now you check and double ....
"A. Check and double check, correct.
"Q. All right. But since all this started I'm sure you have taken the Lexone label that we have involved here on this (inaudible coughing in mike) I assume you have taken it and looked at the back of it?
"A. Since then.
"Q. Since that time?
"A. Since that time.
"Q. Okay. And you noticed on the back of it that it has the directions on it to put a pint out per acre?
"A. Yes, sir.
"Q. Okay. And you of course did not notice that the afternoon that you all were hurrying to try to get this out before the rain?
"A. No, sir." (Emphasis added.)