535 So.2d 1057 (1988)
Kenneth Odea SAWYER, Plaintiff-Appellant,
v.
NIAGARA MACHINE AND TOOL WORKS, INC. and Dittco Products, Inc., Defendant-Appellee.
No. 20033-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1988.
Writ Denied January 13, 1989.
*1058 Bruscato, Loomis & Street, Monroe by C. Daniel Street, for plaintiff-appellant.
Theus, Grisham, Davis & Leigh, Monroe by Ronald L. Davis, Jr., for defendant-appellee.
Before HALL, JASPER E. JONES and NORRIS, JJ.
JASPER E. JONES, Judge.
In this action, based upon products liability, for damages due to personal injury the plaintiff, Kenneth O. Sawyer, appeals a judgment rejecting his demands against Niagara Machine & Tool Works, Inc., and its insurer, Insurance Company of North America. We affirm.
The plaintiff was employed by Dittco Products, Inc., in its window plant. On November 14, 1983, Sawyer and a co-worker, Greg Welch, were using three power presses to stamp slots and holes in aluminum material to be used for window frames. One of the presses had been manufactured by Niagara in 1942 or 1943.
A piece of material jammed as it was being inserted into the Niagara press. Sawyer attempted to free the material. As he did so the piece suddenly slipped on into the machine causing Sawyer to lose his balance and fall against the press. Sawyer placed his right hand into the ram area of the press to catch himself and as he was in this position Welch activated the press causing Sawyer's right thumb to be crushed between the ram and the top of the die.
Plaintiff brought this suit against Niagara and Dittco. Later Sawyer's demands against Dittco were dismissed and INA was added as a defendant.
At trial Sawyer contended the Niagara press was defective due to its lack of guards. Sawyer presented expert testimony that the press could have been equipped with a universal guard which would have prevented Sawyer's hand from falling against the ram and that it was Niagara's duty to do so under industry standards in effect when the press was built.
The defendants contended the press was not defective. They presented evidence that this press is a very versatile machine whose actual use is determined by the dies used in it by its user. They presented expert evidence that a proper guard could not be made until one knew the type of die to be used and how it would be fed. They also presented evidence that the industry custom was for the user of a press to provide appropriate guards for use with the dies incorporated into the press by the ultimate user.
The trial judge found the user was responsible for guarding the press and that it was not unreasonably dangerous to normal use as manufactured because the "pinch point" which injured plaintiff was created by the user's tooling of the press. He rejected plaintiff's demands and this appeal followed.
Sawyer makes one assignment of error on appeal. He contends the trial judge erred in finding the press was not defective. Sawyer argues the press was defective by reason of its lack of guards or other safety devices and due to its lack of appropriate warnings concerning its use.
In order to recover the plaintiff needed to prove three elements:
(1) that the press was in normal use;
(2) that the press was defective or unreasonably dangerous to normal use; and
(3) that his injuries were caused by the defect.
Lanclos v. Rockwell Intern. Corp., 470 So.2d 924 (La.App. 3d Cir.1985), writ den., 477 So.2d 87 (La.1985).
The dispute here is whether the press was defective. Because the press did not malfunction or have any error in its construction the issue is whether the press was of a defective design.
Defective design is a factual issue and depends upon the circumstances of each case, Cobb v. Insured Lloyds, 387 So.2d 13 (La.App. 3d Cir.1980), writ den., 394 So.2d 615 (La.1981) LeBleu v. Homelite Div. of Textron, Inc., 509 So.2d 563 (La.App. 3d Cir.1987), and the trial judge's decision on this issue will not be disturbed absent manifest *1059 error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Dittco had equipped this press with a unitized or "slap" die. In this type die the upper and lower portions are attached in a single unit. The die is not attached to the ram. The ram strikes the top of the die when activated. The die is spring loaded so that it opens when not under pressure from the ram thus permitting material to be inserted and withdrawn. The area within the die where the metal is punched is the "point of operation." This is the area between the upper and lower part of the die. The area where the ram contacts the top of the die is a "pinch point."
The use of a slap die is unusual. Most dies are made in two separate pieces. The lower portion is attached to the bed of the press and the upper portion is attached to the ram. With such dies the only pinch point is the point of operation.
Dr. Leighton Sissum, a mechanical engineer called by plaintiff as an expert, testified Niagara could have built a universal guard for the press which would have protected the pinch point. He also opined that Niagara had a duty under the 1937 American Standards Association standards to guard this point. Dr. Sissum also testified the pinch point could have been eliminated by building the press so that the ram's stroke was adjustable.
The defense presented two expert witnesses. Mr. Stanton Cheyney had been employed by Niagara since 1952 and he was a mechanical engineer. Mr. Thomas Freidrichson was a consulting mechanical engineer.
Mr. Cheyney testified that no manufacturer routinely equipped its presses with guards. He explained that this was so because there is no one guard which will function with all different dies and feeding systems.
Cheyney testified that industry standards made it the user's responsibility to provide guards. He further testified that this had been true since 1922 and that it was explicitly set out in the more recent standards.[1]
*1060 Mr. Cheyney testified the pinch point which injured Sawyer was a function of the die used by Dittco. He was of the opinion that only the user of the press was in a position to guard it properly. Mr. Cheyney testified there were several flaws in the universal guard proposed by Sissum and he testified no adjustable stroke presses were made in the United States.
Mr. Friedrichson testified that under the 1937 ASA standards the method of guarding depends on the method of feeding and that guarding is the responsibility of the die setter not the press manufacturer. He also testified that later standards explicitly placed the duty to guard pinch points on the user of the press.
Friedrichson testified he knew of no press manufacturer who provided universal guards and also that he knew of no way such a guard could be made. He further testified only the user of the press was in a position to properly guard pinch points created by the use of slap dies.
The evidence shows the press was shipped to the original purchaser in 1943 without dies or guards. It is also clear that the press has no pinch points until it is equipped with dies. The evidence as to whether the press is defective is primarily expert testimony and it is contradictory with each expert having testified in accord with the interest of the party calling him.
The trial judge has great discretion in determining the effect and weight to be given expert testimony. Friday's Plumbing & Heating Co. v. Byers, 415 So.2d 256 (La.App. 2d Cir.1982).
Evidence of industry custom, while not controlling, may be considered in determining the duties owed by the manufacturer of a product. Leonard v. Albany Mach. & Supply Co., 339 So.2d 458 (La.App. 1st Cir.1976), writ den., 341 So.2d 419 (La. 1977). Cf. Winterrowd v. Travelers Indem. Co., 452 So.2d 269 (La.App. 2d Cir. 1984), affirmed, 462 So.2d 639 (La.1985) (ANSI standards provide guidelines to determine negligence), and Parker v. South La. Contractors, Inc., 370 So.2d 1310 (La. App. 1st Cir.1979), writ den., 374 So.2d 662 (La.1979) (OSHA standards may be guidelines to determine negligence).
Sawyer argues that an industry custom of not providing guards does not mean the press is not defective due to the lack of guards. For support he cites Lanclos v. Rockwell Intern. Corp., supra.
In Lanclos the plaintiff was injured while using a wood shaper. The shaper was described as a versatile milling tool with exposed circular blades which rotate rapidly. The shaper was sold with no guard protecting the user from the blades. Rockwell contended that no universal guard could be developed due to the versatility of the shaper and that the operator was in the best position to build guards for each operation. The court rejected this defense finding it was Rockwell's duty to provide a guard for general uses and to warn the operator to take additional precautions in those operations it did not guard.
Lanclos is distinguishable. The shaper was sold as a complete unit. There, as the court held, the manufacturer was in the best position to provide guards.
The Niagara press was sold without dies. It was not complete or ready for use until the user obtained and installed a die of his choice. Until this was done the location of pinch points and the method of feeding, both of which must be considered in designing guards, were unknown. Thus, in contrast to Lanclos and as found by the trial judge, the user was in the best position to provide guards.
A generally more similar case to the case here under contention is Leonard v. Albany Mach. & Supply Co., supra. In Leonard the victim was a sawmill worker who died as a result of being struck in the head by a piece of lumber thrown from a trimmer. A trimmer is a device with multiple saw blades which is installed in a sawmill *1061 production line and used to trim lumber to the desired length. The short pieces trimmed from the lumber are often ejected from the trimmer.
The custom of the industry was for the user to provide guards because only after it was installed in the production line could the type of guard needed be determined and because of the difficulty of providing a universal guard. Upon this basis the Leonard court reversed the trial court's finding that the unguarded trimmer was defectively designed.
This case is similar to Leonard in that the proper guards could not be designed until the die was installed just as the proper guards for the trimmer could not be designed until it was installed in the production line. The cases are also similar in that in each instance providing the machine without guards was in conformity with industry custom.
The testimony of the defense experts Cheyney and Friedrichson was reasonable and is strongly supported by their explanations of the reasons behind the industry practice. This evidence provides a strong basis for the trial judge's conclusion of fact that the Niagara press was not of a defective design. Though the testimony of the plaintiff's expert was contrary to the testimony of the defendant's experts the trial judge was within his discretion in accepting the testimony of the defense experts.
Sawyer makes an alternative contention that even if the press is not defectively designed he is still entitled to recover due to the lack of proper warnings. He argues that Niagara had a duty to warn users of the press not to use it without adequate guards for the pinch points created by dies.
A manufacturer has a duty to instruct reasonably forseeable users of its product with regard to its safe use even though the product is not defective. Amco Und. of Audubon Ins. Co. v. American R. & S. Corp., 329 So.2d 501 (La.App. 1st Cir.1976); Winterrowd, supra.
A manufacturer is not required to warn of dangers which are open and obvious. Foster v. Marshall, 341 So.2d 1354 (La. App. 2d Cir.1977), writ refused, 343 So.2d 1067 (La.1977); Lanclos v. Rockwell Intern. Corp., supra; Leonard v. Albany Mach. & Supply Co., supra.
Sawyer's contention overlooks the apparent nature of the danger of operating the press without guards for pinch points. It would be apparent to any operator of the press that the ram operates with great force and that using the press without guards places one at risk of coming into accidental contact with the pinch points.
Under these circumstances Niagara was under no duty to warn of the apparent danger of operating the press without guards.
Because we affirm the judgment of the district court rejecting plaintiff's demands we do not consider his arguments as to damages. The judgment of the district court is affirmed at appellant's costs.
NOTES
[1] The 1937 American Standards Association safety code for presses, B11-1937, provides:

SECTION 7. MAKING AND SETTING DIES
7.1. DESIGN AND CONSTRUCTION. Newly constructed dies shall be designed and constructed so as to involve the least possible hazard to the press operator. They should be cut away so that unnecessary crushing hazards will not exist. They should be so arranged that the operator will assume a natural position and do his work in the safest possible manner. Dies shall be so designed and constructed as to provide or permit safeguarding as required in Section 5. The die setter should be held responsible for procuring and installing, when he sets the dies for any operation, an effective guard or safe feeding arrangement suitable to the operation.
The 1971 American National Standards Institute, Inc., standards, ANSI B11.1-1971, provides:
5.1 Responsibility
It shall be the responsibility of the employer to provide and insure the usage of either a point of operation guard or a properly applied and adjusted point of operation device on every operation performed on a mechanical power press.
6.5 Unitized Tooling
If unitized tooling is used, the opening between the top of the punch holder and the face of the slide, or striking pad, shall be safeguarded in accordance with the requirements of Section 5.
6.9.1 Procedures
The employer shall establish a die setting procedure that will ensure compliance with Section 5.
1971 Occupation Safety and Health Administration regulations provide as follows:
§ 1910.217(c)
Safeguarding the point of operation(1) General requirements. (1) It shall be the responsibility of the employer to provide and insure the usage of "point of operation guards" or properly applied and adjusted point of operation devices on every operation performed on a mechanical power press.
§ 1910.217(d)(5)
(5) Unitized tooling. If unitized tooling is used, the opening between the top of the punch holder and the face of the slide, or striking pad, shall be safe-guarded in accordance with the requirements of paragraph (c) of this section.
The 1982 ANSI standards, AWSI B11.1-1982, provide:
5. Safeguarding the Point of Operation.
5.1 Responsibility. It shall be the responsibility of the employer to provide and ensure the usage of either a point-of-operation guard or a properly applied and adjusted point-of-operation device on every operation performed on a press production system.
6.5 Unitized Tooling. If unitized tooling is used, the opening between the top of the punch holder and the face of the slide, or striking pad, shall be safeguarded in accordance with the requirements of Section 5.
6.9 Die Setting 6.9.1 Procedures. The employer shall establish a die-setting procedure that will ensure compliance with Section 5.