James R. LAVESPERE,
Plaintiff–Appellant
Cross–Appellee,

and

Liberty Mutual Insurance Co.,
Intervenor–Appellant
Cross–Appellee,

v.

NIAGARA MACHINE & TOOL WORKS, INC., Defendant–Appellee Cross–Appellant.

No. 89–4208.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1990.

Henry B. Bruser, III, Gold, Weems, Bruser, Sharp, Sues & Rundell, Alexandria, La., for Lavespere.

Steven P. Mansour, Michael T. Johnson, Bolen, Erwin, Johnson & Coleman, Alexandria, La., for Liberty Mut. Ins. Co.

Brian D. Smith, Lunn, Irion, Johnson, Salley & Carlisle, Shreveport, La., for Niagara Mach. & Tool Works, Inc.

Before RUBIN, JONES, and BARKSDALE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

An employee of a small manufacturing concern, after sustaining severe injuries to his hands while working with a machine owned by his employer, brought suit against the manufacturer of the machine, alleging that it was defectively designed in that it lacked adequate operator safe-guards. After the district court had granted the manufacturer's supplemental motion for summary judgment on the ground that the device in question was not defective as a matter of law, the employee filed a motion for reconsideration and, in support of that motion, proffered evidentiary materials that he had previously failed to submit. The district court admitted and considered those materials, but concluded that they did not warrant setting aside the original judgment. We affirm both the court's decision to consider the materials and its ruling on the motion for reconsideration.

I

Niagara Machine & Tool Works has for several decades manufactured a wide variety of hydraulic and electric-powered industrial metal-working machines known as "presses." One such device, the general-purpose "press brake," can be used to bend or to cut metal parts. It presses the metal part between two "dies" (hard metal teeth), one located on a stationary base, the other on a heavy metal "ram" that, when activated by a hand or foot control, descends toward the base. Though the base and the ram of the press brake have slots into which dies can be inserted, the dies are not a part of the press brake itself. The operator of the press brake must select dies that are appropriate for the particular bending or cutting operation to be performed. As manufactured, the press brake also lacks "point of operation" safeguards, that is, some mechanism or device that will either prevent the ram from becoming activated while the operator's hands are between the dies or exclude the operator's hands from that space while the ram is in motion. Niagara, however, manufactures several such safeguards and offers them for sale to its press brake customers.

In 1978 Baker Manufacturing Company, a small manufacturing concern whose facilities are located in Louisiana, purchased from Rex Supply Company a used general-purpose, foot-activated press brake that had been manufactured by Niagara about 1966. Some years later, Baker purchased a point-of-operation safeguard for the press

brake known as a "light screen". This device, which is equipped with an electric eye, detects the presence of the operator's hands when they are in the point of operation. Although Baker installed the device on the press brake, Baker did not make it operational.

In the spring of 1985, James Lavespere, a recent high school graduate, went to work for Baker in its metal shop. After he had been on the job a few weeks, his superiors assigned him the task of "knifing" (bending) "verticals," six-foot long pieces of metal used in the construction of lockers. For this purpose, Lavespere employed the Niagara press brake. Lavespere, like the other operators of the machine, found that verticals would sometimes stick to the upper die after having been knifed. Although his supervisors and co-workers had advised him to free the verticals using a rubber mallet, Lavespere found it easier to tear them loose with his hands, a procedure that required him to insert his hands into the point of operation.

Only a few days after he had begun to perform the knifing operation on his own, Lavespere attempted to free a stuck vertical with his hands. As he did so, the ram unexpectedly became activated and descended, pressing his fingers between the vertical and the lower die and causing severe injuries to his hands, including the loss of several fingers. Although none of the parties has established the cause of the ram's activation, they suggest two possibilities: the press brake went through a "double stroke" or Lavespere inadvertently stepped on the foot pedal.

One year later Lavespere filed suit in federal court against Niagara Machine & Tool Works, as manufacturer, and Rex Supply Company, as vendor, of the press brake, contending that the press brake, insofar as it lacked a point-of-operation safeguard, was defectively designed. Baker's workers' compensation insurer, Liberty Mutual Insurance Company, intervened, seeking to recover workers' compensation benefits that it had paid to Lavespere. The

district court subsequently dismissed Rex Supply.

Niagara filed a motion for summary judgment, contending that Niagara owed no duty to Lavespere to guard the press brake and that Baker's failure to guard the press brake was a superseding cause of the accident. It accompanied the motion with several attachments, including an affidavit by Stanton Cheyney, an engineer and an officer of Niagara. In the affidavit, Cheyney alleged that it is not possible to design a "universal" point-of-operation safeguard, that is, one single safeguard capable of protecting all operators of the machine in all of its possible applications. According to Cheyney, which safeguard is appropriate and effective varies with the particular bending or cutting operation to be performed. For these reasons, Cheyney explained, it is the custom of the industry not to install point-of-operation safeguards on the machines, but to leave that responsibility to the purchaser. The district court denied the motion.

Niagara then filed a supplemental motion for summary judgment. Although Niagara relied on the same allegations of fact and the same attachments as before, it submitted a new memorandum of authorities based on recent Louisiana jurisprudence, in particular, the decision of the Second Circuit Court of Appeal in *Sawyer v. Niagara Machine & Tool Works, Inc.*[1] Lavespere filed an opposition to the motion without evidentiary attachments, stating that he was content to rely on the attachments he had submitted along with his opposition to Niagara's original motion for summary judgment. This time the district court granted Niagara's motion, ruling that its press brake was not defective as a matter of law.

Shortly thereafter Lavespere filed a motion for reconsideration, seeking to have the ruling overturned. In that motion, Lavespere alleged that "through inadvertence, mistake and excusable neglect," he had failed to file the deposition of Dr. Kenneth Blundell along with his opposition to Niagara's supplemental motion for summa-

1. 535 So.2d 1057 (La.App.1988), *writ denied,* 536 So.2d 1222 (La.1989).

ry judgment, and requested leave to file that deposition for the court's consideration. In that deposition, Blundell testified that in his opinion Niagara could have designed and installed a point-of-operation safeguard that would have been effective at preventing injuries in a considerable percentage of the possible applications of the machine, perhaps as much as eighty-five percent, and, further, that the technology necessary for designing and installing such a point-of-operation guard had been available to Niagara for many years prior to 1966. Although the district court allowed Lavespere to admit the deposition, it nevertheless refused to reverse its earlier judgment; the district court remained persuaded that Niagara was entitled to judgment as a matter of law.

Lavespere and Liberty Mutual appeal from the summary judgment in favor of Niagara, while Niagara appeals from the ruling granting Lavespere's motion for leave to file Blundell's deposition.

## II

Niagara's objection to the court's decision to admit and consider Blundell's deposition is two-fold: (i) Lavespere did not timely submit the deposition; and (ii) Blundell was not qualified to testify as an expert on the subject of designing point-of-operation safeguards.

## A

Niagara alleges, and Lavespere does not deny, that Blundell's deposition was available to Lavespere two years before Niagara filed its supplemental motion for summary judgment and that Lavespere could have submitted it as an attachment to his opposition to that motion. Because Lavespere failed to do so, Niagara argues, he

may not be permitted to file the transcript belatedly unless he can provide an adequate excuse for his default. According to Niagara, Lavespere has not done so.

That Lavespere should have filed Blundell's deposition before the rendition of summary judgment is not disputed. In case after case, the federal courts have declared that if an opponent of a motion for summary judgment wishes the district court to consider certain evidentiary materials in ruling on the motion, then she "must" submit those materials along with her opposition to the motion, or at least before the ruling on the motion.[2] The question presented here is what corrective steps, if any, the nonmoving party may take in the event she fails to comply with that rule and, in particular, under what circumstances she may submit the materials for the court's consideration in connection with a motion for reconsideration of the summary judgment.

Unfortunately, the federal courts so far have not provided a uniform answer to this question. In some decisions on this subject one finds statements that, at least on first reading, seem to suggest that a district court has no discretion to admit and consider such belatedly-submitted evidentiary materials unless the evidence they contain is "newly-discovered."[3] Others suggest that the materials need not set forth newly-discovered evidence, provided that the defaulting party can show her failure to submit the document on time was the result of "excusable neglect."[4] Still others, which reflect an even more indulgent approach, contain statements suggesting that the district court has discretion to admit and consider a document that does not set forth newly-discovered evidence, at least so long as the defaulting party provides some plausible explanation for the default,[5] or the

**2.** *See generally Couch v. Travelers Ins. Co.,* 551 F.2d 958, 959–60 (5th Cir.1977); *see also Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir. 1985); *Mas Marques v. Digital Equip. Corp.,* 637 F.2d 24, 29–30 (1st Cir.1980).

**3.** *See Keene Corp. v. International Fidelity Ins. Co.,* 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd,* 735 F.2d 1367 (7th Cir.1984); *Vartan v. Harristown Dev. Corp.,* 661 F.Supp. 596, 606–07

& n. 4 (M.D.Pa.1987); *see also Harsco Corp.,* 779 F.2d at 909; *DeLong Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135, 1139–40 (3d Cir.1980).

**4.** *See Mas Marques,* 637 F.2d at 29–30; *Couch,* 551 F.2d at 959–60.

**5.** *See Hooks v. Hooks,* 771 F.2d 935, 946 (6th Cir.1985); *Anderson v. Montgomery Ward & Co.,* 704 F.Supp 162, 163 (N.D.Ill.1989); *Michigan*

document contains critical evidence and admitting it will not result in undue prejudice to the other party.[6]

We do not pretend to be able to reconcile all·of the apparently conflicting statements set forth in these opinions. Nor do we believe it would be particularly instructive to subject each of these decisions to detailed dissection, noting those statements that we endorse and pointing out instances of loose language and slips of the tongue that have, quite unintentionally, produced apparent inconsistency. Under the circumstances, we prefer to start afresh, setting out what we consider to be the governing principles established by the Federal Rules of Civil Procedure.

■ When a party files a motion for reconsideration of a summary judgment and submits in support of that motion evidentiary materials that she failed to file on time, the extent of the court's discretion to reopen the case and to consider the materials depends, in the first instance, on the particular Federal Rule of Civil Procedure under which the motion arises. The Federal Rules do not recognize a "motion for reconsideration" *in haec verba.* We have consistently stated, however, that a motion so denominated, provided that it challenges the prior judgment on the merits, will be treated as either a motion "to alter or amend" under Rule 59(e) or a motion for "relief from judgment" under Rule 60(b).[7] Under which Rule the motion falls turns on the time at which the motion is served. If the motion is served within ten days of the rendition of judgment, the motion falls under Rule 59(e); if it is served after that time, it falls under Rule 60(b).[8]

■ To reopen the case under Rule 60(b) on the basis of evidence that was available before rendition of judgment but that was not submitted·in a timely fashion, the mover has two options. She can proceed under Rule 60(b)(1), in which case she must show that her default was attributable to "mistake, inadvertence, surprise, or excusable neglect."[9] The motion may instead be brought under Rule 60(b)(6).[10] Although the mover then need not show excusable neglect in order to prevail, the newly-submitted evidence must establish a fact "so central to the litigation that it shows the initial judgment to have been manifestly unjust."[11]

■ In determining whether the moving party has established "excusable neglect" under Rule 60(b)(1) or manifest injustice under Rule 60(b)(6), the district court enjoys considerable discretion.[12] That discretion, however, is not boundless. In the case of a motion for reconsideration brought under Rule 60(b)(1), for example, if the failure of the party to submit the evidentiary materials in question is attributable solely to the negligence or carelessness of that party's attorney, then it would be an abuse of discretion for the court to reopen the case and to consider the evidence.[13]

■ A motion to reopen a case under Rule 59(e), though subject to much more stringent time limitations than a comparable motion under Rule 60(b), is not controlled by the same exacting substantive

State Podiatry Ass'n v. Blue Cross & Blue Shield, 681 F.Supp. 1239, 1241 (E.D.Mich.1987).

**6.** *See Good Luck Nursing Home,· Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980).

**7.** *Forsythe v. Saudi Arabian Airlines Corp.,* 885 F.2d 285, 288 (5th Cir.1989); *Charles L.M. v. Northeast Indep. School Dist.,* 884 F.2d 869, 869–70 (5th Cir.1989); *Harcon Barge Co. v. D & G Boat Rentals,* 784 F.2d 665, 669–70 (5th Cir. 1986) (en banc).

**8.** *Harcon Barge,* 784 F.2d at 667.

**9.** Fed.R.Civ.P. 60(b)(1). *See Mas Marques,* 637 F.2d at 29–30.

**10.** Fed.R.Civ.P. 60(b)(6). *See Good Luck Nursing Home,* 636 F.2d at 577.

**11.** *See Good Luck Nursing Home,* 636 F.2d at 577.

**12.** *United States v. $22,640.00 in United States Currency,* 615 F.2d 356, 360 (5th Cir.1980); *see also Smith v. Alumax Extrusions, Inc.,* 868 F.2d 1469, 1471 (5th Cir.1989).

**13.** *Pryor v. United States Postal Serv.,* 769 F.2d 281, 287–89 (5th Cir.1985); *Blinder, Robinson & Co. v. SEC,* 748 F.2d 1415, 1420 (10th Cir.1984).

requirements.[14] Unlike Rule 60(b), Rule 59(e) does not set forth any specific grounds for relief. Nor can we discern any basis for engrafting the strict limitations of the former onto the latter. We conclude, therefore, that in order to reopen a case under Rule 59(e) on the basis of evidentiary materials that were not timely submitted, the mover need not first show that her default was the result of mistake, inadvertence, surprise, or excusable neglect or that the evidence is such as to show that the judgment was manifestly wrong.

■ Because Rule 59(e) is not subject to the limitations of Rule 60(b), the district court has considerable discretion in deciding whether to reopen a case in response to a motion for reconsideration arising under the former rule. That discretion, of course, is not limitless. In any case in which a party seeks to upset a summary judgment on the basis of evidence she failed to introduce on time, two important judicial imperatives clash: the need · to bring litigation to an end and the need to render just decisions on the basis of all the facts.[15] The task of the district court in such a case is to strike the proper balance between these competing interests. In order to do this, the court should consider, among other things, the reasons for the moving party's default, the importance of the omitted evidence to the moving party's case, whether the evidence was available to the non-movant before she responded to the summary judgment motion, and the likelihood that the nonmoving party will suffer unfair prejudice if the case is reopened.

For this framework for analyzing and evaluating motions for reconsideration to stand, it must, of course, be consistent with this court's prior decisions. Niagara, citing passages from *Waltman v. International Paper Co.*,[16] maintains that this court is

among those that has adopted the "excusable neglect" standard, for Rule (59E) motions that is, the rule that in order to obtain relief from a summary judgment on the basis of evidentiary materials that the moving party failed to submit on time, the party must establish that her failure was due to excusable neglect. We disagree.

In *Waltman* the plaintiff, after the district court had granted the defendant's motion for summary judgment, filed a motion for reconsideration under Rule 59(e). Attached to the motion were several evidentiary documents, all but one of which had been at the plaintiff's disposal at the time she filed her opposition. The district court refused to consider the documents on the ground that their submission was untimely. On appeal, this court affirmed. Quoting a federal district court decision, *Keene Corp. v. International Fidelity Insurance Co.*,[17] the court stated the purpose of Rule 59(e) motions for reconsideration was "'to correct manifest errors of law or fact or to present newly discovered evidence.'"[18] The court then noted that the plaintiff sought neither to correct errors of law or fact nor to introduce newly discovered evidence through her motion for reconsideration. On the contrary, the court observed, the evidentiary materials submitted along with the motion for reconsideration had been available to the plaintiff at the time she filed her opposition to the defendant's motion for summary judgment. Because the plaintiff did not offer "any explanation" for her failure to submit them at that time, the court concluded, her submission of the materials was "untimely" and, accordingly, the district court had not erred in refusing to consider those materials.[19]

Although the *Waltman* court's remarks arguably are susceptible of the construction that Niagara attempts to put on them,

14. *See Smith v. Morris & Manning,* 657 F.Supp. 180, 181 (S.D.N.Y.1987).

15. *See generally Good Luck Nursing Home,* 636 F.2d at 577–78; *Compton v. Alton S.S. Co.,* 608 F.2d 96, 102 (4th Cir.1979); *Bankers Mortgage Co. v. United States,* 423 F.2d 73, 77 (5th Cir. 1970).

16. 875 F.2d 468 (5th Cir.1989).

17. 561 F.Supp. 656, 665 (N.D.Ill.1982), *aff'd,* 735 F.2d 1367 (7th Cir.1984).

18. *Waltman,* 875 F.2d at 473.

19. *Id.* at 474.

we do not believe that that construction is sound. Our conclusion rests on two considerations. First, in its summary of the plaintiff's conduct, the court faulted her not for failing to show "excusable neglect," but for failing to provide "any explanation" for her tardiness.[20] The two expressions are not equivalent, and it may be that the court would have found sufficient an explanation not rising to the level of "excusable neglect." Second, and more important, the court's remarks were made on review of a ruling *denying* a motion for reconsideration. The court's attention, therefore, was focused on finding some justification for the district court's *exclusion* of the late-filed evidence. Because that is so, the court's listing of the defaults of the non-moving party, including her failure to provide a suitable explanation for submitting the affidavits late, does not necessarily establish that the absence of such defaults is a *sine qua non* for *admitting* such evidence and reopening a judgment. On the contrary, those statements indicate only that if a party is guilty of such defaults, then a district court *may*, without committing an abuse of discretion, refuse to admit and consider belatedly-filed evidentiary materials. Therefore, nothing in *Waltman* is inconsistent with the principles we set forth above.

█ Applying those principles to this case, we begin by determining whether Lavespere's motion for reconsideration arose under Rule 59(e) or Rule 60(b). Lavespere served that motion, which challenged the summary judgment on its merits well before 10 days from the entry of judgment had passed. Characterized according to the rule of *Harcon Barge,* the motion falls under Rule 59(e).

█ The next step in the inquiry is to determine whether the district court abused its discretion by permitting Lavespere to file the deposition along with his motion for reconsideration and in taking that deposition into account in ruling on the motion. Lavespere's failure to file the deposition on time was attributable to his attorney's negligence, not to strategic consid-

erations. Further, Blundell's deposition, which contains Lavespere's only evidence concerning defective design and causation, is of critical importance to Lavespere's case and is highly relevant to the question whether summary judgment should have been granted. Finally, Niagara has not alleged, nor does it appear likely, that Niagara was injured or prejudiced in any way as a result of the district court's reopening the case to consider Blundell's deposition. Lavespere served the motion and his request to file the deposition within eight days of the court's ruling on the motion for summary judgment. Considering these circumstances, we cannot conclude that the district court abused its discretion by reopening the case and admitting and considering Blundell's deposition.

Although we affirm the district court's decision to rescue Lavespere's case from the peril created by his attorney's blunder, it would be a mistake to infer from our decision that attorneys practicing in this circuit may now ignore deadlines for the submission of evidence with impunity. Our decision means only that a district court faced with circumstances analogous to those present here *may* reopen the case; it does not mean that a district court faced with such circumstances *should* or *must* do so.

### B

Niagara's second attack on the district court's decision to allow Lavespere to file Blundell's deposition is that Blundell was not qualified to give expert testimony on the subject of designing point-of-operation safeguards. In particular Niagara complains that Blundell had had limited practical experience with press brakes and gained his knowledge of the press brake industry and of press brake safety systems through reading articles listed in a bibliography published by one of Niagara's competitors.

█ As a general rule, the admissibility of evidence on a motion for summary

judgment is subject to the same rules that govern the admissibility of evidence at trial.[21] Thus, before a district court may consider expert opinion evidence set forth in an affidavit or other evidentiary document offered in support of or in opposition to a motion for summary judgment, the court must find, among other things, that that evidence meets the requirements of Federal Rule of Evidence 702, namely, that the person who provided the evidence is "qualified as an expert by knowledge, skill, experience, training, or education."[22] The determination whether the person is so qualified is committed to the discretion of the district court, even in cases in which the court has no opportunity to observe the witness firsthand; the court's ruling therefore "must be sustained unless manifestly erroneous."[23] Despite this broad discretion, district and appellate courts must carefully review the testimony of a purported expert witness to ensure that the witness has the necessary qualifications and that there is a sufficient basis for his opinion.[24]

Blundell's academic credentials are impressive. He holds a doctorate in mechanical engineering and a master's degree in production engineering and, at the time that he was deposed, taught courses on the former subject as a professor at the University of Missouri. Further, although Blundell had never designed a press brake or safeguards for that device, he had had at least some practical experience designing mechanical devices similar to the press brake and safeguards suitable for those devices, both in his capacity as production manager of his family's manufacturing business and in his capacity as associate

director of the university's safety design center. While serving in the former capacity, Blundell testified, he had designed several small power presses and had specified and installed safety systems for a variety of power presses, including a forty-ton punch press. Finally, we note that prior to this litigation, Blundell had been qualified in other courts around the country to testify as an expert on the subject of designing safeguards for devices similar to press brakes. Under these circumstances, we cannot fault the district court for its decision to accept Blundell as an expert.[25]

Niagara contends, nevertheless, that because Blundell's knowledge of the particular device under scrutiny here—the press brake—was purely academic, that is, he learned everything he knew about the device and safety systems suitable for it through reviewing technical literature rather than through hands-on experience, Blundell was not an expert on the subject of designing safeguards for that particular device. The legal assumption on which this contention rests is that an "academic" who has had no practical experience designing a particular product cannot be qualified to testify as an expert concerning the design of that product in a product liability action. The assumption is erroneous.

Rule 702 provides that a witness may be qualified as an expert "by knowledge, skill, experience, training, *or* education."[26] The disjunctive conjunction, which we must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five bases listed.[27] A witness therefore can qualify as an expert even though he lacks practical experience, provided that he has received suitable

---

**21.** *Munoz v. International Alliance of Theatrical Stage Employees & Moving Picture Mach. Operators,* 563 F.2d 205, 207 n. 1 (5th Cir.1977); C. Wright, A. Miller, & M. Kane, 10A Fed.Prac. & Proc. § 2738, at 470 & n. 7, 474 & n. 12 (2d ed. 1983).

**22.** Fed.R.Evid. 702; *see also Washington v. Armstrong World Indus.,* 839 F.2d 1121, 1123 (5th Cir.1988); *Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1318 (9th Cir.1985).

**23.** *Christophersen v. Allied–Signal Corp.,* 902 F.2d 362, 364 (5th Cir.1990); *Washington,* 839

F.2d at 1123; *see also Crawford v. Worth,* 447 F.2d 738, 741 (5th Cir.1971).

**24.** *Peteet v. Dow Chem.,* 868 F.2d 1428, 1431 (5th Cir.1989).

**25.** *See DaSilva v. American Brands,* 845 F.2d 356, 360 (1st Cir.1988).

**26.** Fed.R.Evid. 702 (emphasis added).

**27.** *See Garrett v. Desa Indus., Inc.,* 705 F.2d 721, 724 (4th Cir.1983).

training or education or has otherwise gained the requisite knowledge or skill.[28] Thus, although the absence of hands-on experience is certainly relevant to the determination whether to accept a witness as an expert, it is not determinative.

The rule advocated by Niagara not only is inconsistent with the language of Rule 702, but also would work an undue hardship on plaintiffs in product liability actions. Recognizing this problem, other federal appeals courts have squarely rejected this proposal.[29] As the First Circuit stated in *DaSilva v. American Brands*,[30]

> [s]uch an approach would often mean that the only experts who could testify regarding a machine are those who have an interest in defending its design. We therefore are not persuaded to abandon the general rule that a court should consider all relevant qualifications when ruling on the admissibility of expert testimony.[31]

This court's decision in *Perkins v. Volkswagen*,[32] on which Niagara relies, does not demand a different conclusion. The plaintiff's expert witness held a degree in mechanical engineering but had no experience in designing entire automobiles. For this reason, the district court accepted the witness as an expert on the subject of general mechanical engineering principles, but refused to allow him to testify on the subject of automotive design. On appeal, the plaintiff complained of the restriction placed on his expert's testimony. This court affirmed, concluding that the district court's decision was not "manifestly erroneous." [33] The affirmation of the district court's ruling therefore means merely that if a district court refuses to allow one who has received only academic training to testify as an expert concerning product de-

sign, its decision may be affirmed. It clearly does not mean that if a district court faced with the same circumstances rules the other way, its decision will be overturned.

For these reasons, we conclude that the district court did not err by accepting Blundell as an expert on the subject of designing safety systems for press brakes.

## III

The next issue presented for our consideration is whether the district court, after taking Blundell's deposition into account, correctly denied Lavespere's motion for reconsideration of the summary judgment. Lavespere and Liberty Mutual attack the district court's decision on two grounds. First, the court misinterpreted and misapplied both the law governing summary judgments and the applicable substantive law. Second, it was improper for the court to grant Niagara's supplemental motion for summary judgment after having denied its original motion for summary judgment, for Niagara presented no new evidence in support of the supplemental motion. We address each of these contentions in turn.

### A

#### 1

■ Review of a district court's ruling on a motion for summary judgment is plenary.[34] The appeals court applies the same standards as those that govern the district court's determination.[35]

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled

**28.** *Id.* at 724.

**29.** *See id.* at 724; *DaSilva*, 845 F.2d at 361; *Mannino v. International Mfg.*, 650 F.2d 846, 850 (6th Cir.1981); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (3d Cir.1979).

**30.** 845 F.2d 356 (1st Cir.1988).

**31.** *Id.* at 361.

**32.** 596 F.2d 681 (5th Cir.1979).

**33.** *Id.* at 682.

**34.** *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 79 (5th Cir.1987); *FDIC v. Dye*, 642 F.2d 837, 841 (5th Cir.1981) (order granting summary judgment is subject to "independent review").

**35.** *Lodge Hall*, 831 F.2d at 79.

to judgment as a matter of law." [36] To determine whether there are any genuine issues of material fact, the court must first consult the applicable substantive law to ascertain what factual issues are material.[37] Having done that, the court must review the evidence bearing on those issues, viewing the facts and inferences therefrom in the light most favorable to the nonmoving party.[38] Before it can find that there are no genuine material factual issues, the court must be satisfied that no reasonable trier of fact could have found for the nonmoving party,[39] or in other words, that the evidence favoring the non-moving party is insufficient to enable a reasonable jury to return a verdict in her favor.[40]

In the summary-judgment context, the rules governing burden of proof are critically important. The moving party bears the burden of establishing that there are no genuine issues of material fact.[41] To satisfy this burden, the moving party may either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense.[42] Once the moving party makes that showing, however, the burden shifts to the nonmoving party to show that summary judgment is not appropriate.[43] The nonmoving party cannot discharge that burden by referring to the "mere allegations or denials" of the nonmoving party's pleadings; rather, that party must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing that a genuine issue exists.[44]

Whether summary judgment is appropriate may depend in part on the nature of the issues before the court. For example, this court has consistently declared that "the use of summary judgment is rarely appropriate in negligence or products liability cases, even where the material facts are not disputed." [45] In *Fontenot v. Upjohn Co.*,[46] this court explained the reasons behind that principle:

> An inherently normative issue, such as whether a product is impermissibly dangerous or was defectively designed, is not, of course, susceptible to summary judgment.... The evidence requires balancing by the jury of the utility of the product against the likelihood of, and gravity of, injury from its use.[47]

Nevertheless, this court has upheld summary judgments in products liability actions on finding that the evidence was insufficient to create a genuine issue of material fact concerning the defendant's alleged failure to comply with that normative

**36.** Fed.R.Civ.P. 56(c).

**37.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958 (5th Cir.1988).

**38.** *Lodge Hall*, 831 F.2d at 79.

**39.** *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bache v. American Tel. & Tel.*, 840 F.2d 283 (5th Cir.1988).

**40.** *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

**41.** *Lodge Hall*, 831 F.2d at 79; *see also* 10A C. Wright, A. Miller, & M. Kane, § 2727, at 121.

**42.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Isquith*

*v. Middle South Utils.*, 847 F.2d 186, 198 (5th Cir.1988).

**43.** *Lodge Hall*, 831 F.2d at 79; *see also* 10A C. Wright, A. Miller, & M. Kane, § 2727, at 143–45 & nn.28 & 29.

**44.** Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Isquith*, 847 F.2d at 198–99.

**45.** *Trevino v. Yamaha Motor Corp.*, 882 F.2d 182, 184 (5th Cir.1989); *Miller–Schmidt v. Gastech, Inc.*, 864 F.2d 1181, 1185 (5th Cir.1989); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1196 (5th Cir.1986); *Davidson v. Stanadyne*, 718 F.2d 1334, 1338 (5th Cir.1983).

**46.** 780 F.2d 1190 (5th Cir.1986).

**47.** *Id.* at 1196.

standard.[48]

2

Although it is clear that Louisiana law governs Lavespere's right to recovery, it is not clear *what* Louisiana law governs. After Lavespere's accident and the initiation of this litigation but before the rendition of judgment, the Louisiana Legislature enacted the Louisiana Products Liability Act [49] (LPLA or the Act). The legislation was designed to modify Louisiana's law of strict products liability in several respects, including the requisites for recovery in cases based on claims of defective or unreasonably dangerous product design.[50] Because Lavespere's case rests on such a claim,[51] we must ascertain the particular respects in which the Act changes the law, determine whether those changes have any possible significance for the success of his case, and, if so, consider whether the relevant provisions of the Act should be retroactively applied.

The law of products liability in force in Louisiana at the time of Lavespere's accident was set out in the landmark case of *Halphen v. Johns–Manville Sales Corp.*[52] In order to recover from a manufacturer, the plaintiff was required to prove, among other things, that the product which injured him was "unreasonably dangerous to normal use."[53] The plaintiff could make this showing by establishing that the product was "unreasonably dangerous per se,"

suffered from some flaw in construction or composition, lacked adequate warnings, or exhibited a "defective" design.[54] A design could be considered defective for any of a number of reasons: (i) "the danger-in-fact, whether foreseeable or not, outweighs the utility of the product"; (ii) although the utility of the product outweighs its risk, "alternative products were available to serve the same needs or desires with less risk of harm"; or (iii) although the utility of the product outweighs its risk, "there was a feasible way to design the product with less harmful consequences."[55]

Of these theories of recovery, the third defective-design theory best corresponds with Lavespere's claim. Lavespere does not contend that the press brake's danger-in-fact outweighs its utility or that there were other products available to do the same work as that performed by the press brake. Instead, he faults Niagara for failing to incorporate into the press brake various kinds of safety devices such as "dual-hand controls," the "interlock guard," or the "distance bar." Courts inside and outside Louisiana have unanimously concluded that claims regarding the absence of safety devices should be treated as claims of defective design.[56]

The *Halphen* decision left many important questions unanswered, including precisely what showing a plaintiff who relied on the third defective-design theory was required to make in order to carry his

---

**48.** *See Trevino*, 882 F.2d at 184–86; *Miller-Schmidt*, 864 F.2d at 1185.

**49.** La.Rev.Stat.Ann. §§ 9:2800.51–:2800.59 (West Supp.1990) (effective Sept. 1, 1988).

**50.** *See* Crawford, Developments in the Law, 1987–1988—Torts, 49 La.L.Rev. 543, 543–44 (1988); Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565, 587–88, 606–10 (1989); Galligan, The Louisiana Products Liability Act: Making Sense of It All, 49 La.L.Rev. 629, 630–32, 634–38 (1989); Comment, Retroactive Application of the Louisiana Products Liability Act: A Civilian Analysis, 49 La.L.Rev. 939, 942–46 (1989).

**51.** *See infra* text accompanying notes 55 & 56.

**52.** 484 So.2d 110 (La.1986).

**53.** *Id.* at 113.

**54.** *Id.* at 113–15.

**55.** *Id.* at 115.

**56.** *See Thompson v. Tuggle*, 486 So.2d 144, 159 (La.App.1986) (Domengeaux, J., dissenting); *see also Fabian v. E.W. Bliss Co.*, 582 F.2d 1257, 1261 (10th Cir.1978) (construing New Mexico law); *Titus v. Bethlehem Steel Corp.*, 91 Cal. App.3d 372, 381, 154 Cal.Rptr. 122, 128 (1979); *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324, 327 (Colo.App.1985); *Solimene v. B. Grauel & Co., K.G.*, 399 Mass. 790, 797, 507 N.E.2d 662, 667 (1987); *Scott v. Allen Bradley*, 139 Mich. App. 665, 670–71, 362 N.W.2d 734, 737 (1984); *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 624–25 (Minn.1984); *Knitz v. Minster Mach. Co.*, 69 Ohio St.2d 460, 466–68, 432 N.E.2d 814, 819 (1982).

burden of proof.[57] Some critics of *Halphen* have argued that in order to prevail on that theory, the plaintiff had only to show that it was possible to design a safer product. According to these commentators, the plaintiff had no obligation to show, for example, that the risks avoided by switching to the safer product design would have outweighed the costs of making the switch (added construction costs and lost product utility, if any) and, further, the defendant could not have defeated the plaintiff's claim by showing the contrary.[58]

This interpretation is doubtful at best. The scholars from whose works the *Halphen* court derived its third defective-design theory suggest, in the very same works, that the balance of costs and benefits associated with switching to the alternative design ought to be a critical element in determining its "feasibility."[59] Dean Keeton, for example, suggested that an alternative product design should be considered "feasible" only if

> a reasonable person would conclude that the magnitude of the danger-in-fact that could have been avoided by the alternative design in the utilization of the scientific technological know-how reasonably available to the defendant outweighed the financial costs of guarding against such avoidable danger, the impairment of the benefits, and any new danger-in-fact that would have been created by the alternative design.[60]

It seems unlikely that the state supreme court, having derived its "feasible alterna-

tive" design theory from Dean Keeton's works, would have rejected his definition of the key term "feasible." That the Louisiana high court would have adopted this definition appears all the more likely when one considers that several state courts which have recognized liability for failure to use a safer, alternative feasible design have defined feasibility in precisely this manner.[61] Further, a rule that excludes risk-utility balancing in determining liability for failure to use a safer, feasible alternative design would have grave economic consequences, consequences that the *Halphen* opinion indicates no intention to ignore.

While we therefore are confident that the state supreme court would consider a cost-benefit analysis to be relevant to the plaintiff's right to recover under *Halphen*'s feasible "alternative" design theory, we are not at all certain how the court would apportion the burden of proof on this matter between the plaintiff and the defendant. As we have already suggested, *Halphen* did not directly address this question. Since the announcement of that decision, neither the supreme court nor any of the state appellate courts has faced the issue. Finally, in those jurisdictions other than Louisiana in which the feasible-alternative design theory has been recognized, there is considerable disagreement.[62] In some jurisdictions, the burden is on the defendant to show that the added costs and diminished utility entailed in the alternative design would outweigh its incremental benefits over the existing design.[63] At the other

---

57. *See* Galligan, *supra* note 50, at 659 & n. 171.

58. *See* Crawford, Developments in the Law, 1985–1986—Torts, 47 La.L.Rev. 485, 486–87 (1986); Kennedy, *supra* note 50, at 607 & n. 174.

59. *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on the Law of Torts § 99, at 699–700 (5th ed. 1984) [hereinafter Prosser & Keeton on Torts]; Keeton, Annual Survey of Texas Law—Torts, 35 Sw. L.J. 1, 9, 12–13 (1981).

60. Prosser & Keeton on Torts, *supra* note 59, § 99, at 700; *see also* Keeton, *supra* note 59, at 12–13.

61. *See Brady v. Melody Homes Mfr.*, 121 Ariz. 253, 258–59, 589 P.2d 896, 901–02 (Ct.App.1978);

*Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404, 413 (Mo.Ct.App.1983); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 67–70, 577 P.2d 1322, 1326–27 (1978) (*en banc*); *Lamon v. McDonnell Douglas Corp.*, 91 Wash.2d 345, 351, 588 P.2d 1346, 1350 (1979).

62. *See generally* Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand. L.Rev. 593, 602–10, 627–30 (1980); Wade, On Product "Design Defects" and Their Actionability, 33 Vand.L.Rev. 551, 558–66, 573–75 (1980).

63. *Taggart v. Richards Medical Co., Inc.*, 677 F.Supp. 1102, 1103–04 (D.Colo.1988) (construing Colorado law); *Caterpillar Tractor Co. v. Beck*,

extreme, some jurisdictions require the plaintiff to show the contrary, that is, that the additional risks avoided by the alternative design outweigh the costs associated with adopting it.[64]

Before the supreme court could answer this and the other questions left unanswered by *Halphen,* the Louisiana Legislature enacted the Louisiana Products Liability Act[65] (LPLA), which evidently was designed to overrule *Halphen* in several respects. Among the targets of the legislation were *Halphen's* theories of recovery for defective design.[66] Section 2800.56 provides that a product is unreasonably dangerous in design if:

(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.[67]

According to Section 2800.54 D,[68] the plaintiff bears the burden of proving both of these elements.[69]

Section 2800.56 effects two changes in the law. First, the new section imposes on the plaintiff the requirement of showing that an algnrnative design was *in existence* at the time the product left the manufacturer's hands. Although the *Halphen* decision did not directly address the matter, it was widely believed that the decision would have permitted the plaintiff to recover simply by showing that a design modification capable of preventing the accident was theoretically possible.[70] Second, the

section modifies, or at least clarifies, the plaintiff's burden of proof by requiring him to show not only that there was an alternative, safer design, but also that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility). As we noted earlier, it is unclear whether the plaintiff bore this burden under *Halphen.* It is at least clear, however, that this risk-utility factor would have been a matter of defense.

Only the second of these changes could make any possible difference to the success of Lavespere's case. Considering the testimony of Blundell that foreign and domestic manufacturers had implemented the design modifications he proposed years before the manufacture of the press that injured Lavespere, we are convinced that he would have satisfied the new "in existence" requirement of section 2800.56(1), assuming that it had applied to him. Whether his evidence was sufficient to satisfy the new "risk-utility" requirement of section 2800.56(2) is a more difficult question. It is therefore necessary to consider whether that provision of the Act should be given retrospective force.

The Louisiana Legislature's most recent expression on the subject of "retroactivity of laws" is found in article 6 of the Louisiana Civil Code:

In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural laws apply both prospectively and retroactively, un-

593 P.2d 871, 884–86 (Alaska 1979); *Barker v. Lull Eng'g Co., Inc.,* 20 Cal.3d 413, 418, 573 P.2d 443, 446, 143 Cal.Rptr. 225, 228 (1978).

**64.** *Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 429–32, 326 N.W.2d 372, 378–79 (1982); *Wilson,* 282 Or. at 68–70, 577 P.2d at 1326–27.

**65.** La.Rev.Stat.Ann. §§ 9:2800.51–:2800.59 (West Supp.1990).

**66.** *See* Crawford, *supra* note 50, at 544; Kennedy, *supra* note 50, at 607–08.

**67.** La.Rev.Stat.Ann. § 9:2800.56 (West Supp. 1990).

**68.** *Id.* § 2800.54 (D) (West Supp.1990).

**69.** *See also* Kennedy, *supra* note 50, at 597–99; Galligan, *supra* note 50, at 670, 674–75.

**70.** *See* authorities collected in note 58, *supra.*

less there is a legislative expression to the contrary.[71]

This article reproduces the substance of former article 8,[72] which provided that new laws were to have prospective effect only, but incorporates the exceptions that the state's courts had engrafted onto both that article and a related "retroactivity of laws" statute, Louisiana Revised Statute 1:2.[73] Under the new article, the court must engage in a two-fold inquiry. First, the court must ascertain whether the legislature expressed an intention that the legislation be applied retroactively or prospectively only. If it did, the inquiry is at an end. If it did not, then the court must ascertain whether the legislation is substantive or procedural.[74]

We are satisfied that the legislature did not express any intention concerning the temporal effect of section 2800.56(2) or, for that matter, any of the provisions of the LPLA. Indeed, it is clear that the legislature went out of its way to remain mute on this subject. Although the Senate version of the Act contained a provision purporting to make the Act apply prospectively only,[75] that provision was deleted as part of a legislative compromise.[76] The final version of the legislation provides merely that "[t]his Act shall become effective September 1, 1988." [77]

Resolution of the retroactivity question therefore turns on the classification of the legislation. Here we are concerned only with the provision in the LPLA that changes the plaintiff's burden of proof in an alternative design case, section 2800.-56(2). It is well settled in Louisiana that laws affecting burden of proof are "procedural" as that term is used in Civil Code article 6.[78] Consequently, 2800.56(2) applies retroactively, at least in those cases in which its application does not raise problems of constitutional dimension.[79] We discern no such problems here.

One might object that our conclusion is at odds with that reached by the Louisiana Court of Appeal, Second Circuit, in *McCoy v. Otis Elevator Co., Inc.*[80] In that case, the plaintiff sued the manufacturer of a freight elevator, arguing that the elevator in which he had been injured was "unreasonably dangerous per se." In its defense, the manufacturer, which recognized that the LPLA had eliminated "unreasonably dangerous per se" as a theory of recovery, argued that the Act applied retroactively. The appellate court disagreed. Noting that the Act "defines the causes of action available under products liability and excludes the unreasonably dangerous per se category of recovery," the court concluded that the legislation was "substantive" and, therefore, should be applied prospectively only.[81]

The *McCoy* court was called on to consider whether the Act retroactively eliminated the cause of action for products that are unreasonably dangerous per se. Thus, the only question before the court was a narrow one: whether the "exclusivity of remedies" clause found in Louisiana Revised Statute 9:2800.54,[82] which had the effect of eliminating that cause of action, should be retroactively applied. The court was not

---

**71.** La.Civ.Code Ann. art. 6 (West 1990) (effective Jan. 1, 1988).

**72.** La.Civ.Code Ann. art. 8 (1870).

**73.** La.Rev.Stat.Ann. § 1:2 (West 1987) ("No Section of the Revised Statutes is retroactive unless it is expressly so stated.").

**74.** *See Ardoin v. Hartford Accident & Indem. Co.*, 360 So.2d 1331, 1338–39 (La.1978).

**75.** *See* 1988 La Sess L.Serv. 684 § 2 (West) ("This Act shall become effective September 1, 1988 and shall apply to all causes of action for damage sustained on or after that date.")

**76.** *See* Kennedy, *supra* note 50, at 625.

**77.** 1988 La. Acts No. 64, § 2.

**78.** *Ardoin*, 360 So.2d at 1339; *Succession of Sanders*, 485 So.2d 126, 131 (La.App.1986); *see also* Comment, *supra* note 50, at 946.

**79.** *See Lott v. Haley*, 370 So.2d 521, 523–24 (La. 1979).

**80.** 546 So.2d 229 (La.App.1989).

**81.** *Id.* at 232.

**82.** La.Rev.Stat.Ann. § 9:2800.54 (A) (West Supp. 1990).

required to consider, as we are here, the quite different question whether other provisions of the Act that are merely procedural should be given retrospective effect. To the extent that the court's remarks concerning the retroactive effect of the Act may be construed to apply to this question, those remarks are dicta.[83]

■ Having determined that section 2800.56(2) applies retroactively, we are now in a position to determine whether Lavespere presented sufficient evidence to survive Niagara's motion for summary judgment. In order defeat that motion, Lavespere was required to present evidence sufficient to enable a reasonable trier of fact to conclude that he had established the essential elements of his claim, including that the risk avoided by the alternative design outweighed the burden of adopting that design.

Although Lavespere introduced evidence that had some bearing on the risk-utility issue, it was not sufficient to carry the day. Lavespere offered no evidence concerning the extent of the risk that the alternative design would have avoided. In particular, Lavespere offered no evidence concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design.

Further, Lavespere introduced little, if any, evidence concerning the burden of switching to the alternative design. Neither in Blundell's deposition nor in any other document submitted by the parties is there any indication of the costs that the manufacturer would have incurred had it used the alternative design.

Perhaps the most significant failure of Lavespere's proof, however, was on the matter of the loss of product utility that

use of the alternative design would have occasioned. Lavespere did provide information, through the deposition of Blundell, that the safeguards he proposed would be compatible with "the vast majority" and "maybe eighty-five percent" of the press brake's possible applications, information suggesting that the safeguards would be wholly or partly incompatible with at least fifteen percent of its possible applications. The record contains no information, however, on the following crucial points: whether the excluded operations could be performed by another device and, if not, what consequences the loss of those operations might have for the metal works industry; assuming that another device could be used, the additional cost to metal works firms of purchasing and maintaining two devices (the modified general-purpose press brake and the other device) instead of one; and, assuming that the safeguards of the modified press brake could be disengaged so that the excluded operations could be performed, the cost to manufacturers to make the safeguards disengagable and the cost to press brake purchasers to disengage and reengage the safeguards. In short, there is no evidence concerning the nature and extent of the economic problems likely generated by rendering the press brake unfit for at least fifteen percent of its possible uses.

Under the circumstances, we have little difficulty concluding that Lavespere's evidence was insufficient to defeat Niagara's motion for summary judgment. His proof of the risk that might have been avoided by the alternative design and of the burden that switching to that design would have entailed was, to say the least, incomplete. Faced with this meagre evidence, no reasonable trier of fact could have concluded that the balance of those two factors tipped in favor of the risk avoided. One cannot balance items of indeterminate weight.[84]

---

**83.** Louisiana courts have on occasion accorded different provisions of a legislative act varying temporal effects. *Compare Tullier v. Tullier,* 464 So.2d 278, 282–83 (La.1985) (the "presumption of community" established in La.Civ.Code art. 2340 (enacted in 1979 La. Acts No. 709, § 1) applies retroactively) *with Hebert v. Weaver,* 484

So.2d 743, 745–46 (La.App.1986) (La.Civil Code arts. 2345 & 2357 (enacted in 1979 La. Acts No. 709, § 1) apply prospectively only).

**84.** *See generally Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 431–32, 326 N.W.2d 372, 378–79

In arriving at this result, we do not mean to suggest that the plaintiff must, in every case, introduce evidence that details and quantifies the risk avoided and the burden incurred in order to prevail under the defective design theory set out in the LPLA. As courts in other jurisdictions that have placed on plaintiffs the burden of proof on the risk-utility issue have suggested, there may be cases in which the judge or the jury, by relying on background knowledge and "common sense," can "fill in the gaps" in the plaintiff's case, estimating the extent of the risk avoided, the costs of implementing the proposed design change, or the adverse effects of the design modification on the utility of the machine.[85] For this to be possible, however, the product itself, or at least the design feature in question, must be relatively uncomplicated, and the implications of the change in design must be such that a layman could readily grasp them.[86] That clearly is not the case here.

Because we have disposed of this case on the basis of the LPLA, we find it unnecessary to consider in detail the pre-LPLA state intermediate appellate court decisions that formed the focal point of the parties' and the district court's attention: *Leonard v. Albany Machine & Supply Co.*,[87] *Lanclos v. Rockwell International Corp.*,[88] and *Sawyer v. Niagara Machine & Tool Works.*[89] We point out, however, that we do not agree with Niagara's proposed reading of *Sawyer.* According to Niagara, that case establishes the rule that in an alternative-design case, the defendant is entitled to judgment as a matter of law provided that the following conditions are satisfied: the product is not sold as a completed unit, the product can be integrated into any number of larger manufacturing systems to perform a variety of different functions, no operator safeguard suitable for one hundred percent of those functions can be devised, and it is the custom of the industry to leave the duty for installing safeguards to industrial users. Admittedly, the opinion does contain language that lends some support to this interpretation. This interpretation, however, ignores the fact that the *Sawyer* court's remarks were made on review of a post-trial judgment in favor of the defendant, a judgment reviewed under a "substantial evidence" standard. As we read the decision, it establishes no more than that if the conditions listed above are satisfied, the trier of fact *may* find in favor of the defendant. The decision certainly does not preclude a trier of fact from finding in favor of a plaintiff who presents proof that his proposed safeguard, though not compatible with all the product's uses, is compatible with most of them, and proof that the risk avoided by the alternative design outweighs the burden of switching to that design.

### B

Liberty Mutual contends that the district court's ruling granting Niagara's supplemental motion for summary judgment was improper given that the court had denied Niagara's original motion for summary judgment and that Niagara presented no new evidence in support of the supplemental motion. According to Liberty Mutual, it is utterly "inexplicable" how a court could one day conclude that there are genuine issues of material fact and later, without the benefit of any additional evidence, conclude to the contrary.

We reject this argument for two reasons. First, we do not find the district court's behavior at all inexplicable. After the ruling on the original motion but before the ruling on the supplemental motion, the Louisiana Court of Appeal, Second

---

(1982); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 68–69, 577 P.2d 1322, 1327 (1978).

**85.** *141 S. Main, Inc. v. Magic Fingers, Inc.*, 49 Ill.App.3d 724, 728–29, 364 N.E.2d 605, 608 (1977); *Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404, 412–13 (Mo.App.1983); *Wilson*, 282 Or. at 67–70, 577 P.2d at 1326–27.

**86.** *Wilson*, 282 Or. at 68–70, 577 P.2d at 1326–27; *Duke*, 660 S.W.2d at 412–13.

**87.** 339 So.2d 458 (La.App.1976).

**88.** 470 So.2d 924 (La.App.1985).

**89.** 535 So.2d 1057 (La.App.1988).

Circuit decided *Sawyer v. Niagara Machine & Tool Works, Inc.,*[90] a case that the district court concluded changed, or at least clarified, the applicable law and, in so doing, redefined the "material issues." Although we do not adopt the district court's reading of that case, we acknowledge that a new decision clarifying the applicable substantive law may justify reexamining a denial of summary judgment.[91] Second, because the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.[92]

## IV

For the reasons presented above, the district court's judgment is AFFIRMED.

**90.** *Id.*

**91.** *See Kenyatta v. Moore,* 623 F.Supp. 220, 222–23 (S.D.Miss.1985).

**92.** Fed.R.Civ.P. 54(b); *Bon Air Hotel v. Time, Inc.,* 426 F.2d 858, 862 (5th Cir.1970).