889 So.2d 359 (2004)
David A. GARCIA, Individually and as Natural Tutor of David A. Garcia, Jr., Plaintiff-Appellant
v.
David James BROWN, et al., Defendants-Appellees.
No. 38,825-CA.
Court of Appeal of Louisiana, Second Circuit.
November 24, 2004.
*360 Kenneth P. Haines, Shreveport, Charles D. Jones, Samuel H. Thomas, Tallulah, for Appellant.
Leroy Smith, Jr., Tallulah, for Appellees.
McCranie, Sistrunk, Anzelmo, Hardy, et al. by: Robert W. Maxwell, Metairie, Darrell R. Sims, Covington, Brown McCarroll by: Craig A. Morgan, for Ford Motor Co.
Before BROWN, STEWART, and PEATROSS, JJ.
BROWN, C.J.
On May 25, 1996, David Garcia, plaintiff herein, and Kristen Brown were traveling from Jackson, Mississippi, to Dallas, Texas, through Louisiana on Interstate 20. Garcia was driving the 1989 Ford Escort owned by Kristen Brown. Kristen was sitting in the front passenger seat. Both were wearing seat belts. The accident giving rise to this lawsuit occurred near Tallulah, Louisiana. Garcia, westbound in the inside or far left lane going 65-70 MPH, crested an overpass and saw a burning vehicle on the opposite side of the interstate. As he slowed down, another westbound vehicle switched lanes in front of Garcia causing him to quickly turn left into the grass median separating I-20's east and westbound lanes. The Escort rotated clockwise, slid sideways, then rolled over twice, landing upright across the median. The driver's side roof of the Escort crushed inward 10 to 11 inches. Garcia suffered a spinal cord injury resulting in permanent quadriplegia. Kristen Brown suffered a shoulder injury from which she recovered. Because the Escort rotated, the passenger side was the lead side in the rollover and its roof buckled up rather than crushing inward.
Garcia filed this action against several defendants; all but Ford Motor Company were dismissed pretrial. Garcia claimed that the roof of the 1989 Ford Escort was defective in design because it was not strong enough to provide its occupants adequate protection in rollover accidents. The case proceeded to a jury trial. Plaintiff's experts opined that Garcia's injuries would not have occurred had the roof crushed less than five inches, and that although the Escort's roof passed the federal strength test, that standard was inadequate. The jury, however, never got an opportunity to rule on the issue. After two weeks of testimony, when plaintiff rested his case, the trial court granted Ford Motor Company's motion for directed verdict. The trial court concluded that plaintiff failed to meet his burden of proof that there existed an alternative design that was capable of preventing his injury. Specifically, the trial court found that plaintiff "has presented only an expert's concept that was untested, unengineered and... mere speculation." With this view we must disagree and therefore reverse and remand.

Discussion
A motion for directed verdict is appropriately granted when it is clear that the facts and inferences point so completely in favor of granting the verdict that *361 reasonable jurors could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605 (La.App. 2d Cir.1991). In reviewing a grant of a directed verdict, the appellate court must determine whether, viewing the evidence submitted, reasonable people could disagree. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827 (La.App. 1st Cir.1992).
In this case, plaintiff's claim is governed by La. R.S. 9:2800.56 of the Louisiana Products Liability Act which states:
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and,
2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of the damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.
Thus, in order for a plaintiff to prevail in an alternative design product liability case, he must present sufficient evidentiary proof that an alternative design existed at the time the product left the manufacturer's control which was capable of preventing plaintiff's injury, and that the likelihood and gravity of plaintiff's injuries outweighed the burden and cost to the manufacturer. La. R.S. 9:2800.56.
Although Ford Motor Company disagreed with what caused plaintiff's injury and the theories of plaintiff's experts, it recognized the constraints of the law concerning directed verdicts and in brief wrote, "[B]ut, for purposes of this appeal only, Ford (Motor Company) will indulge the presumption (that the explanations and theories of plaintiff's experts) should be treated as if (they) were correct."[1]
Plaintiff's experts testified that the roof is part of a vehicle's structural support system that creates a safety cage that should protect its occupants in a crash. If, in a rollover accident, a vehicle's roof substantially crushes into the cab, occupants may suffer disabling head or neck injuries. Although some roof crush is inevitable, and even desirable to absorb some of the energy of the impact, most vehicles do not have enough headroom to allow for more than three to four inches of crush without significantly increasing the risk of injury. Thus, manufacturers should design and construct roofs with that hazard in mind.
Congress passed the National Traffic and Motor Vehicle Safety Act of 1966. This act established Federal Motor Vehicle Safety Standards ("FMVSS"), including minimum standards for crashworthiness and automobile safety performance. The act also provided that "compliance with any FMVSS issued under this title ... would not exempt any person from liability under common law." 49 U.S.C.A. sec 30103(e). The federal standards for roof *362 strengths are minimal and significantly, do not require manufacturers to conduct actual rollover tests. In fact, the only test required is the use of a hydraulic-press procedure exerting a force to the leading edge of the roof of 1.5 times the weight of the vehicle. Ford Motor Company performed and passed this test with the 1989 Escort. Although the 1989 Ford Escort complied with this minimal federal standard, such compliance does not excuse Ford's duty under Louisiana law. See Cipollone v. Liggett Group, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); Hopper v. Crown, 93,201 (La.App. 1st Cir.10/07/94), 646 So.2d 933.
Plaintiff argues that the 1989 Ford Escort design is unreasonably dangerous because, in the event of a rollover accident, the roof of the vehicle does not protect its occupants and puts them at risk of severe bodily injury as a result of the loss of occupant space. Plaintiff's experts proposed that a simple and inexpensive enhancement of the structural strength of the roof would have prevented these type of injuries.
Plaintiff's experts have testified that Garcia's injuries were caused by a loss of occupant space resulting from the impact of the roof during the rollover accident. Further, the experts testified that these injuries would have been prevented had the roof crushed by five inches or less. They also showed that there were a number of vehicles on the road at the time, including several models made by Ford that had roof structures with the strength necessary to withstand the impact sustained in this accident and not crush in more than five inches.
Plaintiff's experts testified that by strengthening the A-pillar of the 1989 Ford Escort's roof structure in one of two ways, Garcia's injuries could have been prevented. The first option was offered by Dr. Nicholas Perrone who suggested extending the reinforcements of the Escort's A-pillar. The current design uses four inches of reinforcement in the A-pillars. It was shown that buckling or crushing occurs at the point that reinforcement ends. Dr. Perrone testified that by extending this reinforcement, Garcia's injuries could have been prevented.
A second expert for plaintiff, Donald Friedman, presented another option for strengthening the roof structure. Friedman testified that by adding an additional 25-50 pounds of steel to the A-pillar at a cost of $15-$25, the A-pillars could be strengthened sufficiently to prevent injuries like those sustained by Garcia. Friedman further testified that the knowledge and means of implementing such an alternative design has existed and been known to Ford since 1971.
Thus, plaintiff offered evidence of an alternative design, existing at the time that the product left the manufacturer's control, that was capable of preventing the injuries he suffered. Plaintiff was also required to present evidence of a risk-utility analysis. Specifically, plaintiff had to introduce evidence concerning the extent of the risk that the alternative design would have avoided, the frequency of accidents like his own, and the economic costs entailed by those accidents. Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167 (5th Cir.1990).
Plaintiff submitted statistical data showing that from 1988-1992 there were 1.88 million occupants involved in rollover accidents. Of those, 53,400 suffered serious to fatal head, neck, and/or face injuries. Further, Friedman testified to the correlation of roof crush to the likelihood and severity of injury to the vehicle occupants. Plaintiff also provided the jury with a detailed list of medical expenses incurred as a result of his accident.
*363 In granting defense's motion for directed verdict, the trial court relied upon Seither v. Winnebago Industries, Inc., 02-2091 (La.App. 4th Cir.07/02/03), 853 So.2d 37. Seither, however, is clearly distinguishable from the present case. In Seither, the plaintiff's alternative design was a significant remodeling of the RV in question. The plaintiff first offered an alternative design based on the unibody construction of a minivan. Prior to trial, Winnebago performed a crash test that proved that plaintiff's alternative design would result in the death of all of its occupants. At trial, the plaintiff offered a second alternative design based on the Dodge Ram van. This new alternative design had "no engineering drawings produced, [it] did not establish any dimensions, and [it] had no analysis or testing" to support it. There was evidence presented that this alternative design would have "added significant weight to the vehicle, and there was no chassis on the market that could support the weight." Id. at 41. Further, plaintiff's expert admitted that the Dodge Ram van, on which his alternative design was based, failed to meet federal standards for crashworthiness.
We do not believe that Seither is applicable; rather, the case most analogous to the present action is Morehead v. Ford Motor Company, 29,399 (La.App.2d Cir.05/21/97), 694 So.2d 650. In that case, the plaintiff alleged that the steering shaft separated on impact with the north edge of the pavement and that the impact caused the total separation of the collapse joint, which rendered the steering mechanism inoperable and caused the accident and damages to the Moreheads. The alternative design proposed by the plaintiff was an extension of the overlap of the two tubes. In Morehead, the court concluded that there was ample testimony and evidence which provided factual support and a basis for the plaintiff's expert's opinion.
We likewise find that there is ample testimony and evidence from which a reasonable juror could have found in favor of plaintiff. The research and studies of roof structure strength, the studies on the correlation of injuries to rollover incidents, and the existence and availability of roof structures strong enough to prevent plaintiff's injuries support the possible conclusion of liability on the part of Ford Motor Company under the Louisiana Product Liability Act.
This evidence, viewed in the light most favorable to the non-moving party, plaintiff, is sufficient. Defendant has argued that plaintiff's expert witnesses have contradicted one another on what roof structure strength would be sufficient to prevent plaintiff's injuries.[2] However, the determination of what weight and credibility to give to each expert's testimony is within the discretion of the jury. See Morehead, supra.[3]

Conclusion
For the foregoing reasons, we reverse and remand this matter for a new trial. All costs here and below are assessed to Ford Motor Company.
REVERSED and REMANDED.
*364 STEWART, J., concurs in result only.
PEATROSS, J., concurs.
NOTES
[1] Ford denies a relationship between the roof crush and Garcia's injury. Ford asserted that it was the force of Garcia's body flying into the roof that caused his injuries rather than the intrusion of the roof into the cab.

Ford also denied Mr. Friedman's theory that the trailing side will be severely weakened when the leading side hits the ground first and for that reason the roof on the trailing side is the most damaged in a rollover accident; thus, because the FMVSS prescribes a test that only evaluates the pressure on the leading side, it is flawed.
[2] Plaintiff's expert, Dr. Nichilas Perrone, stated that a 3-W roof (one that would support three times the weight of the vehicle) would be sufficient to prevent plaintiff's injuries. Plaintiff's other expert witness, Mr. Donald Friedman, testified that a 4-W roof would be required to prevent plaintiff's injuries.
[3] Records maintained by Ford Motor Company, as well as testimony from its employees concerning tests Ford conducted, its knowledge and use of stronger roofs on its vehicles are relevant evidence. The trial court should, on remand, reevaluate its rulings.