# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-125

JAMES E. VIVIANO, ET UX.

VERSUS

PROGRESSIVE SECURITY INS. CO., ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20023238
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

**********

## J. DAVID PAINTER
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**Thibodeaux, Chief Judge, dissents in part and assigns written reasons.**

**Cooks, J., dissents in part for the reasons assigned by Judge Thibodeaux.**

Patrick Craig Morrow, Sr.
James Steven Gates
P. O. Box 1787
Opelousas, LA 70570
Counsel for Plaintiffs-Appellants:
    James E. and Eva Dell Viviano and Angela Menard Boudreaux

M. Katherine P. Martin
A. Gretchen Mayard
P. O. Box 81338
Lafayette, LA 70598-1338
Counsel for Defendant-Appellee:
    State Farm Mutual Auto Ins. Co.

**PAINTER, Judge**

The Plaintiffs, James and Eva Dell Viviano, and their daughter, Angela Boudreaux, appeal as inadequate the award of damages made to them in connection with a rear end collision. For the following reasons, we affirm in part and reverse and render in part.

FACTS

On November 4, 2001, Eva Dell Viviano was driving her vehicle north on U.S. Interstate Highway 49 near Carencro, Louisiana with her daughter, Angela, as a passenger when she was struck from the rear by the vehicle driven by Angela Marcotte. Mrs. Viviano, her husband, James, and her daughter filed suit against Marcotte and her insurer, Progressive Security Insurance Company (Progressive), as well as against their own uninsured/underinsured motorist carrier, State Farm Mutual Automobile Insurance Co. (State Farm). Progressive and Marcotte were no longer parties at the time of trial. Prior to trial, the parties stipulated that Marcotte was solely liable in the accident. Therefore, the only issue for the jury to decide was the quantum of damages. At the conclusion of State Farm's case, the trial court granted its motion for directed verdict with regard to the Plaintiffs' bad faith claims under La.R.S. 22:658. After hearing the evidence, the jury rendered a verdict awarding damages. To Eva Dell Viviano, the jury awarded damages as follows:

| | |
|---|---|
| Physical Injury | 0.00 |
| Physical and Mental Pain and Suffering | 11,000.00 |
| Permanent Disability and/or impairment | 0.00 |
| Past and Future medical expenses | 3,047.10 |
| Loss of Enjoyment of Life | 0.00 |

1

The jury made the following award to Angela Boudreaux:

| | |
|---|---|
| Physical Injury | 5,000.00 |
| Physical and Mental Pain and Suffering | 5,000.00 |
| Permanent Disability and/or impairment | 5,000.00 |
| Past lost earnings | 125.00 |
| Past and Future medical expenses | 6,347.41 |
| Loss of Enjoyment of Life | 0.00 |

The jury made no award of damages for loss of consortium to James Viviano.

The Plaintiffs filed a motion for judgment notwithstanding the verdict and, alternatively, a motion for new trial/additur. The trial court denied both. The Plaintiffs now appeal the jury's awards of damages, the trial court's denial of its post-trial motions, and its grant of the motion for directed verdict concerning their claims under La.R.S. 22:658. State Farm has answered the appeal, asking that the court costs at the trial level be taxed to the Plaintiffs.

DISCUSSION

JNOV and Quantum

A JNOV may be granted on the issue of liability, damages or both. LSA-C.C.P. art. 1811(F). In general, the standard of review of a JNOV on appeal is twofold. First, we must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. To make this determination, we must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. *Daigle v. United States Fidelity and Guaranty Insurance Company*, 94-0304, p. 7 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 436. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. *Id*.

2

*Smith v. Davill Petroleum Co., Inc.*, 97-1596, p. 4 (La.App. 1 Cir. 12/09/98), 744 So.2d 23, 27.

This court recently described the conditions for granting a new trial as follows:

> Articles 1972 and 1973 of the Louisiana Code of Civil Procedure set forth the grounds on which a trial court may grant a motion for new trial. Article 1972(1) states that a new trial shall be granted "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence." Article 1973 states that "[a] new trial may be granted in any case if there is good ground therefore, except as otherwise provided by law." Article 1972 is considered peremptory, so that a trial court would be obligated to order a new trial if the conditions of Article 1972 were met, while Article 1973 is discretionary, and allows a trial court to grant a new trial if the circumstances require. *Poland v. Poland*, 34,085 (La.App. 2 Cir. 12/6/00), 779 So.2d 852; *David v. Meek*, 97-523 (La.App. 1 Cir. 4/8/98), 710 So.2d 1160. In either case, unless the trial court abused its generous discretion, its decision to grant or deny a new trial will not be reversed. *Henderson v. Sellers*, 03-747 (La.App. 3 Cir. 12/17/03), 861 So.2d 923; *Bankston v. Bankston*, 97-2509 (La.App. 1 Cir. 11/6/98), 722 So.2d 46.

*Gauthier v. Gauthier*, 04-198, pp. 6-7 (La.App. 3 Cir. 11/10/04), 886 So.2d 681, 686, *writ not considered*, 896 So.2d 15.

La.Code Civ.P. art 1814 provides, with regard to additur, that:

> If the trial court is of the opinion that the verdict is so excessive or inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case. If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith.

Given this standard of review, we will first consider whether the jury verdict as to each of the Plaintiffs was reasonable and supported by the evidence. If so, we will determine whether the trial court was manifestly erroneous or abused its discretion in denying the motion for JNOV, additur, and/or new trial.

3

1. <u>Eva Dell Viviano</u>

Mrs. Viviano's main claim for damages arises from an alleged injury to her right ear, which resulted in two surgeries and left her deaf in that ear. She testified that her marriage to Mr. Viviano was her second, her first having ended as a result of her husband having physically abused her. She denied having suffered an ear injury as a result of the abuse, although she admitted that he had fractured her ribs, gave her a black eye, and split her lip. However, upon cross-examination, Mrs. Viviano admitted that she had a broken eardrum in the 1970's that healed. Mrs. Viviano further testified that, in 1995, she had sinus surgery and that, prior to the accident, she had episodes of lightheadedness and some congestion in her right ear. She reported that, in 1998, Dr. James Soileau diagnosed her problem as Benign Paroxysmal Positional Vertigo (BPPV), which he treated by a physical adjustment/realignment procedure. She stated that she felt fine after that procedure. On cross-examination, however, she admitted that less than four months after the original repositioning done by Dr. Soileau in 1998, she called Dr. Foreman to get medication for dizziness, was prescribed prednisone, called for additional medication six times between 1998 and 2001, and took medication for dizziness daily during that time. Mrs. Viviano testified that these episodes did not prevent her from driving or from taking part in Angela's school related activities. She denied any pre-accident hearing loss, but admitted that she had a lot of ear, nose, and throat problems between her last pre-accident visit with Dr. Soileau in 1998 and the date of the accident, including sinus problems, upper respiratory infections, and nasal discharge. She further admitted that prior to the accident, she was taking medications for fibromyalgia. She denied that Dr. Soileau had spoken to her about the possibility of a fistula before the accident.

4

Mrs. Viviano testified that the force of the rear-end collision threw her back and forth in her seat and when her vehicle stopped, her ears were stopped up and she was very dizzy. She and her daughter were taken by an ambulance to Doctor's Hospital in Opelousas. Later, she saw Dr. William A. Dupon for treatment of neck and shoulder pain. She testified that, on her first post-accident visit, she told him she was having problems with dizziness. He gave her medication and sent her to physical therapy. Mrs. Viviano testified that the physical therapy helped her neck and shoulder but made her so dizzy that she had to stop. She stated that she would become dizzy to the point that she could not function and could no longer do housework, or yard work as she had previously done. She testified that she would stay in bed for days at a time. Dr. Foreman put her on medications but the problem got worse so he referred her to Dr. Soileau. She stated that Dr. Soileau again diagnosed BPPV and again did the procedure for that condition, but that the spells came back. It was Mrs. Viviano's testimony that Dr. Soileau did more tests and told her that she had a fistula, or tear in one of the membranes between the inner and middle ear, and recommended surgery to repair the damage. She stated that Dr. Gerard Gianoli performed the surgery in July 2002, put a tube in her ear, and did a spinal tap. It was her testimony that after the surgery, she could no longer hear with her right ear. She testified that Dr. Gianoli did another surgery in July 2003. She stated that she still gets dizzy and gets panic attacks in large places. The hearing aid which she now requires gives her trouble, she stated, because moisture accumulates in her ear and the hearing aid slips. She stated that she cannot do housework because it hurts her lower back and has had to hire household help. She further testified that she had not participated in any social activities since the accident, where prior to the

5

accident she had enjoyed fishing at Toledo Bend, travel with her husband and friends, and monthly pokeno parties. Mrs. Viviano testified that she has lost forty pounds due to the medication. As a result, she states that she feels depressed, her clothes don't fit, and she doesn't have the energy to cook. Mrs. Viviano explained that the dizziness and lightheadedness she had felt prior to the accident were very different from what she felt afterwards.

Dr. William A. Dupon, a family practitioner, testified at trial via deposition. He stated that he began acting as Mrs. Viviano's family physician in August or September 2001 when he treated her for insomnia and nervousness. He saw her after the accident on November 13, 2001 for complaints of neck, back, jaw, and shoulder pain. He diagnosed a soft tissue injury, prescribed Vioxx and Robaxin, a muscle relaxant, and sent her to physical therapy. Contrary to Mrs. Viviano's testimony, Dr. Dupon's record did not reflect complaints of dizziness or vertigo. On later visits, he felt the physical therapy was helping. By January 2002, she had no more muscle spasm but was still complaining of back and neck pain as well as stopped up ears. At that time, he prescribed an additional two weeks of physical therapy. She returned in April 2002, complaining of a rash and a fever and, in May 2002, seeking treatment for a sore throat and an "icky" feeling in her right ear. He stated that his examination revealed a perforated right ear drum and a macerated ear canal, that is, the ear canal was moist, a little infected, and contained debris. He diagnosed otitis externa. In testimony, he stated that otitis externa is caused by such things as putting cotton swabs in the ear thereby introducing too much bacteria. It was his testimony that otitis externa will not cause a perforation of the eardrum, which is caused by infection or trauma.

6

The testimony of Drs. Foreman and Soileau indicated that Mrs. Viviano was treated for a multiplicity of problems with her right ear and upper respiratory tract prior to the accident. Dr. Soileau treated her for BPPV and diagnosed a hearing loss in her right ear. It is not clear whether objective tests for fistula were conducted, but Dr. Soileau's testimony suggests that he at least considered the existence of a fistula. Dr. Foreman stated that between 1998 and 2001, Mrs. Viviano called him at least six times for medications for dizziness and lightheadedness

After the accident, Mrs. Viviano returned to Dr. Foreman with complaints of dizziness. It was brought out on cross-examination that she told him she was having a little lightheadedness which was not too bad and was not severe or debilitating. She was again treated by Dr. Soileau for BPPV but was ultimately diagnosed, through objective testing, as having a fistula, or tiny hole in the membranes separating the inner and middle ears. Dr. Soileau referred her to Dr. Gerard Gianoli for surgery. In July 2002, he surgically repaired the fistula, although he could not actually see it, a hole in her eardrum, and the BPPV. She required further surgery in July 2003 for further hearing loss and another perforated eardrum. However, Dr. Gianoli opined that the second perforated eardrum was caused by an infection unrelated to the first surgery.

"In a tort action, plaintiff bears the burden of proving by a preponderance of the evidence both the injury and a causal connection between the injury and the tort." *Fontenot v. Duplechine*, 04-424, p. 7 (La.App. 3 Cir. 12/8/04), 891 So.2d 41, 47. However, under certain circumstances, a plaintiff may take advantage of a presumption of causation:

> Louisiana law provides a presumption of causation between a plaintiff's injuries and a certain accident provided the plaintiff was in good health

7

prior to the accident, but commencing with the accident, the symptoms of the disabling symptoms appear and continuously manifest themselves afterwards. *Housley v. Cerise*, 579 So.2d 973 (La.1991); *citing Lucas v. Insurance Co. of N. Am.*, 342 So.2d 591 (La.1977). This presumption of causation must be supported by medical evidence that shows a reasonable possibility of a causal connection between the accident and the disabling condition. Id. "Whether an accident caused a person's injuries is a question of fact which should not be reversed on appeal absent manifest error." *Blackshear*, 94-765, p. 10-11; 647 So.2d at 595; *citing Mart*, 505 So.2d 1120.

*Carrier v. Nobel Ins. Co.*, 01-0983, p. 3 (La.App. 3 Cir. 2/6/02), 817 So.2d 126, 130-131, *writs denied*, 02-0728 (La. 5/10/02), 815 So.2d 843, 02-0739 (La. 5/10/02), 815 So.2d 845.

"If the plaintiff makes that showing that the injured person was in good health to utilize the presumption of causation, the burden shifts to the defendant to show some other particular incident that could have caused the injury in question." *Lombas v. Southern Foods, Inc.*, 00-26, p. 12 (La.App. 5 Cir. 5/30/00), 760 So.2d 1282, 1289. The question of whether a plaintiff is entitled to the *Housley* presumption is factual, and should not be disturbed in the absence of manifest error. *Seitz v. Scofield*, 01-1295 (La.App. 5 Cir. 2/26/02), 812 So.2d 764, *writ denied*, 02-0861 (La. 5/24/02), 816 So.2d 855.

From the testimony admitted at trial, the jury may have concluded that (1) Mrs. Viviano was not in good health prior to the accident, and (2) that her ear and hearing problems did not result from the rear-end collision. Mrs. Viviano had a history of ear problems and vertigo, which preceded the accident by many years. Dr. Soileau's testimony suggests that she may have had a fistula in 1998. Dr. Foreman testified that the continued symptoms of vertigo could mean that the original BPPV was not resolved by Dr. Soileau's treatment in 1998. Mrs. Viviano acknowledged that, when she returned to Dr. Soileau after the accident, she did not tell him that she had

continued to have dizziness bad enough to require medication during the interim between her last visit and the accident. The emergency room's and Acadian Ambulance's records contradict Mrs. Viviano's statement that she felt dizziness and fullness in her ears immediately after the accident. Dr. Dupon's records indicate no ear complaints until January 2001. Further, Dr. Foreman stated that fistulas are not commonly caused by accidents, absent a blow to the head. Dr. Soileau testified that Mrs. Viviano was already suffering from hearing loss in her right ear in 1998, although Mrs. Viviano stated that she was not. The medical testimony was clear that Mrs. Viviano had suffered eardrum perforations prior to the accident, and that such perforations are seldom caused by rear-end collision but rather by infection or a direct blow to the ear. Dr. Gianoli opined that the second ear drum perforation that he treated was not caused by the first surgery but by an unrelated infection which occurred six months later. His testimony indicated that the hearing loss could have been related either to the fistula or to the infection. Dr. Gianoli's testimony indicated that a fistula can be caused by trauma. However, he also made it clear that it can be caused by coughing, sneezing, and nose blowing, all of which commonly occur with the kind of respiratory and sinus problems from which Mrs Viviano frequently suffered. Further, Mrs. Viviano testified that she traveled by airplane in the months just prior to the accident, and Dr. Gianoli's testimony indicated that the change in pressure common to air travel can cause a fistula to occur.

Given this evidence, the jury could have found that Mrs. Viviano was not entitled to the *Housley* presumption and that she had not shown, by a preponderance of the evidence, a causal connection. Given such a finding, the awards of damages made to Mrs. Viviano were reasonable for a soft tissue injury which resolved within

three months of the accident and required only minimal medical treatment and physical therapy. Having found that the jury's verdict was reasonable and supported by the evidence, we cannot say that the trial court was manifestly erroneous in denying the JNOV as to Mrs. Viviano or abused its discretion by denying the motion for additur or new trial.

2. Angela Boudreaux

Angela Boudreaux testified that immediately after the accident she felt head and neck pain. She was taken by ambulance, along with her mother, to Doctor's Hospital in Opelousas. In the ambulance, she was given medication to calm her down and for pain. She had pain in her rib area from being slung forward against her seat belt. The accident occurred on a Sunday and she stated that she went back to work the next Friday or Monday. At the time, she was working for Dr. Dupon and saw him for the problems which allegedly arose out of the accident. She testified that she told him she had neck pain, headaches in the temple area, sternum pain and pain in her ribs. According to Mrs. Boudreaux, Dr. Dupon sent her to physical therapy for her neck pain and treated her headaches as migraines. She stated that the prescribed three week course of physical therapy helped her neck and back pain. Mrs. Boudreaux testified that, sometime after the accident, she began grinding her teeth at night and began having headaches all the time. An MRI was performed on her in May 2002 but it was normal. She testified that the pain began to affect her social activities and that she would frequently ask to go home early because of headache pain. Dr. Dupon referred her to Dr. James Pearce, a TMJ specialist, who, according to Mrs. Boudreaux, felt there was a popping on the left side of her jaw. He took impressions of her teeth and started her on splint therapy. It was her testimony that she began

10

wearing the splint all the time, then graduated to wearing the top at night only and the bottom all the time. She testified that she keeps the top splint with her, and, if she is having pain, she puts it on during the day. She stated that if she does not wear the splint at night, she grinds her teeth and has pain the next day. Mrs. Boudreaux testified that cold weather makes the pain worse. She further stated that she has to be careful how wide she opens her mouth when yawning, and she can no longer eat foods that require hard chewing, such as steak. It is her stated understanding that her condition will not change. On cross-examination, she admitted that she had a history of migraine headaches prior to the accident and that she did not inform Dr. Dupon or her dentist, Dr. Pearce, of this. She further admitted that she had taken medication for stress and anxiety before and after the accident and that she did not tell her treating physicians that she had been taking the medication prior to the accident. It was also brought out that she had sinus surgery a few years prior to the accident.

Dr. Dupon testified that he first treated Angela for accident related problems on November 12, 2001. His records showed that she complained of intermittent pain between the shoulder blades and in the right flank. He testified that she reported the pain to be better with the application of heat and worse when she carried her book bag. He stated that he found muscle spasm on the right side, that her scapular was tender over the last set of ribs on the front side. He diagnosed muscle spasm and costochondritis. He sent her to physical therapy and continued the medications she was given at the emergency room. He continued to treat her intermittently and in October 2002 treated her for migraine. In November she complained of tension, rather than migraine, headaches in the temple region. Dr. Dupon testified that he had

11

an MRI performed on Mrs. Boudreaux and, when the results were normal, referred her to Dr. Pearce.

Dr. Pearce, who was qualified as expert in the field of dentistry with a specialty in the treatment of TMJ disorders, testified at trial via deposition. He testified that when he first saw Angela Boudreaux on November 11, 2002, she was complaining of bilateral temporal headaches, jaw pain on both sides, pain in the area of her left ear, and sensitivity in her teeth. He stated that she reported having had these problems since the automobile accident and had become aware that she was grinding and clenching her teeth at night. It was his testimony that she told him that, in the accident, she hit her head on the headrest, heard a pop in her jaw, and immediately had neck pain. He stated that TMJ problems were commonly seen in connection with automobile accidents. An EMG showed hyperactivity in her cervical muscles, temporalis muscle, and the masseter on the side of the face. Dr. Pearce found a displaced disc in her left jaw joint. He testified that he prescribed muscle relaxers and anti-inflammatory medication. He found that her bite had been corrected with braces and was not a contributory factor in the TMJ disorder. Initially, he treated her with medication, soft diet, and moist heat. He prescribed Robaxin, a muscle relaxer, and Lodine, an anti-inflammatory. He stated that he found her to be a cooperative patient. When she was still complaining of problems in January 2003, he fitted her for a splint to wear over her teeth to help the muscles relax so that the soft tissue in her jaw joint could heal. He opined that the splint had helped reduce and resolve her symptoms. He stated that he told her to wear the splint twenty-four hours a day at first and that when she returned in February she reported a reduction in pain. As her pain diminished, he discontinued her medications and weaned her off the splint by

12

instructing her to wear it primarily at night. On her last visit in May 2003, she reported no pain and was wearing the splint only at night. He testified that he expects her jaw to continue popping and making noise and that she should continue to wear the splint at night. He rated her chance of needing surgical intervention as one chance in four. He opined that her complaints of pain were not consistent with migraine. However, on cross-examination, he confirmed that a person with TMJ disorder could be mis-diagnosed as having migraines or sinus problems. He agreed that if she had no complaints of headaches in the six months after the accident, the accident may not have caused the TMJ disorder. He further agreed that she had given no history of being treated for anxiety and stress prior to the accident and that stress can cause a person to clench their teeth in such a way as to cause TMJ dysfunction. On re-direct, however, he confirmed that the degree of wear and tear on her teeth was consistent with a person who had had an onset of symptoms within the year.

Finally, Dr. Ghyass Rizk, an endocrinologist, testified via deposition. He stated that he treated Angela Boudreaux in June 2000 for diarrhea and weight loss. Between that time and summer 2001, he treated her for weight loss, stress, anxiety and migraine headaches. He testified that, during that time, she never complained of regular headaches, grinding of teeth or facial pain.

The supreme court in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260-61 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994) (footnote omitted) explained the appropriate standard of review applicable to general damage awards:

> The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from *Gaspard v. LeMaire*, 245 La. 239, 158 So.2d 149 (1963) through *Coco v. Winston*

13

*Industries, Inc.*, 341 So.2d 332 (La.1976), and through *Reck* to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

Mrs. Boudreaux had soft tissue injuries which resolved quickly and incurred TMJ disorder which has responded to conservative treatment and which will, in all likelihood, never require surgical intervention. The jury awarded Mrs. Boudreaux $15,000.00 in general damages. While on the low end of acceptable awards, given the injuries incurred, we cannot say that the award is so low as to constitute an abuse of discretion by the trial court. The award is, therefore, reasonable in light of the evidence. Additionally, we cannot say that the trial court erred manifestly in denying a JNOV with regard to Mrs. Boudreaux or abused its discretion by denying the motion for additur or new trial.

3. James Viviano

The Vivianos assert that the evidence supports an award for loss of consortium to Mr. Viviano. His testimony in this regard was as follows: He married Eva Dell Viviano in 1992 and adopted her daughter, Angela. They had a normal active life before the accident, would go fishing at their camp at Toledo Bend, and participated in the school and extra-curricular activities of their daughter. He admitted that Mrs. Viviano had vertigo problems before the accident but denied that they prevented her from participating in activities. He stated that, after the accident, his wife was afraid to go anywhere and got mad at the least little thing. He stated that they didn't have the love life they had before the accident, but stated that he loves her as much as ever.

14

He stated that they had not sought counseling. Mrs. Viviano testified that they had not had sex since the accident. Mrs. Viviano further testified that she was unable to do the housework or yard work since the accident and it had been necessary to hire a housekeeper. Housekeeping bills in the amount of $1000.00 were submitted into evidence. Mr. Viviano admitted that he had always helped with the yard work.

> The elements of a loss of consortium claim are loss of society, sex, service, and support. Society includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price.

*Lawson v. Mitsubishi Motor Sales of America, Inc.*, 04-839, p. 22 (La.App. 3 Cir. 12/29/04), 896 So.2d 149, 163.

In light of the evidence adduced at trial, it is clear that Mr. Viviano incurred at least some loss of consortium. Even if Mrs. Viviano's ear injury is not related to the accident, the testimony indicates that the back and neck injuries affected her ability to function in the home and her relationship with her husband. Therefore, the failure to make an award of consortium is neither reasonable nor supported by the evidence. Accordingly, we find that the jury erred in failing to award damages for loss of consortium and that the trial court erred in failing to grant a JNOV in this regard. After reviewing the record in this regard, we conclude that an award of $5,000.00 is appropriate.

La.R.S. 22:658

15

The Plaintiffs assert that the trial court erred in granting the Defendant's motion for directed verdict dismissing their claims pursuant to La.R.S. 22:658, which provides, in pertinent part, that:

> A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
>
> . . . .
>
> B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.

The burden of proving entitlement to such penalties and attorney's fees has been explained as follows:

> One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause. . . . The statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense. Especially when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist.

16

*Reed v. State Farm Mut. Auto. Ins. Co.*, 03-0107, p. 13 (La. 10/21/03), 857 So.2d 1012, 1020-21, *writ denied*, 04-3147 (La. 3/24/05), 896 So.2d 1044 (citations omitted).

A motion for directed verdict may be granted if it is clear that the facts and inferences weigh so heavily in favor of granting the verdict that reasonable jurors could not arrive at a contrary verdict. On review, an appellate court must decide if, in light of the evidence of record, reasonable people could disagree with the trial court's determination. *Garcia v. Brown*, 38,825,(La.App. 2 Cir. 11/24/04), 889 So.2d 359. Given the evidence presented to the court with regard to the causal connection of the damages claimed to the accident, we find that reasonable people could not disagree that the Defendant had a reasonable basis to defend the claim. Accordingly, we affirm the dismissal of this claim.

Court Costs

The Defendant asserts that the trial court erred in assessing it with all the court costs at the trial level. We disagree.

> Louisiana Code of Civil Procedure Article 1920 provides, in pertinent part, that "the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." The trial court's great discretion in assessing court costs will not be reversed absent an abuse of that discretion. *Frazier v. Zapata Protein USA, Inc.*, 02-605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141, *writs denied*, 03-126, 03-145, (La.3/21/03), 840 So.2d 537, 539.

*Sims v. Liberty Mut. Ins. Co.*, 04-584. p. 22 (La.App. 3 Cir. 3/2/05), 897So.2d 834, 852.

While we do not have the benefit of the trial court's reasons for assessing court costs as it did, we see no special indication that the trial court abused its discretion by taxing costs against State Farm.

17

CONCLUSION

For these reasons, the judgment of the trial court is reversed insofar as it denies James Viviano's claim for loss of consortium. Judgment is rendered against the Defendant and in favor of James Viviano in the amount of $5,000.00. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed two-thirds to the Plaintiffs and one-third to the Defendants.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

JAMES E. VIVIANO, ET UX.

VERSUS

PROGRESSIVE SECURITY INS. CO., ET AL.


THIBODEAUX, Chief Judge, dissenting in part.

The manifest error rule governs the parameters by which an appellate court must judge fact-intensive cases. While an appellate court must pay deference to the fact finder, it must not be enslaved by those findings under the rubric of "manifest error" or "clearly erroneous." Indeed, blind adherence to the manifest error rule is antithetical to our function as an appellate court. As the Louisiana Supreme Court explained in *Ambrose v. New Orleans Police Dep't Amb. Serv.*, 93-3099 (La. 7/5/94), 639 So.2d 216, it is the responsibility, indeed the constitutional *duty*, of an appellate court to scrutinize facts. Failure to do so results in an unfortunate miscarriage of justice as is manifested in this majority opinion, and results in a less than critical analysis of the entire record.

Indisputably, Mrs. Viviano had a history of lightheadedness and dizziness. Dr. Foreman had been treating her since 1993 and had treated her regularly for "mundane dizziness," i.e., something that is seen regularly in patients on a weekly basis. Her dizziness was related to benign paroxysmal positional vertigo (BPPV), a very common inner-ear problem that "comes and goes." BPPV does not cause a hearing loss; a fistula does. Mrs. Viviano called Dr. Foreman on several occasions

for dizziness medication associated with allergies and sinus problems. Dr. Foreman testified, however, that the pre-accident medications did not lead him to conclude that Mrs. Viviano was suffering from a fistula. He was asked, "Did she have complaints that you thought would be consistent with a fistula in either or both of her ears" before the accident? He testified, "No. I never thought she had a fistula." He goes on to say that "I never detected it and feel like she did not have a fistula prior to that [November 2001]. It's as simple as that." Dr. Foreman was adamant that "I would never had suggested a fistula and never will, ever admit to her having a fistula prior to the accident."

Dr. Soileau's post-accident test in 2002 showed that Mrs. Viviano's left ear problem was almost identical to that which existed in 1998. However, compared to 1998, her right ear "had some worsening of hearing loss." Although Dr. Soileau did indicate that a fistula was a "possibility" in 1998, Mrs. Viviano was not diagnosed as having one. In fact, the objective tests administered by Dr. Soileau did *not* show a fistula in 1998 but demonstrated one in 2002. Dr. Soileau could not say whether Mrs. Viviano had or did not have one before the accident. He could steadfastly state, however, that Mrs. Viviano's hearing lost was "demonstrably worse than it had been three years earlier in her right ear."

Dr. Soileau's tests were very "reliable." Dr. Gianoli performed the surgery on Mrs. Viviano and opined that, in order to get the right diagnosis, one would need some very "exquisite test equipment" which Dr. Soileau possessed. This "exquisite test equipment" was the mechanism used to administer the objective test on Mrs. Viviano which detected a post-accident fistula.

The fact of the matter is that the medical testimony went *uncontradicted*. There is not one piece of medical testimony in the record indicating the existence of a fistula *before* the accident. All of the doctors testified that it developed *after* the

2

accident. Although Dr. Soileau *considered* the *possibility* of a fistula in 1998, Mrs. Viviano did not experience the debilitating post-accident conditions before the accident. One has to wonder why her condition deteriorated after the accident if she had a fistula *before* the accident.

In deciding this case under the manifest error rule, the majority has failed to apply the admonition of *Mart v. Hill*, 505 So.2d 1120, 1127 (1987) that "[a]n appellate court is not required . . . to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles." (citations omitted). Our own circuit has concluded in *Marks v. Ohmeda, Inc.*, 03-1446 (La.App. 3 Cir. 3/31/04), 871 So.2d 1148 that "[a]ccording to Louisiana jurisprudence, where the plaintiff's expert provided uncontradicted testimony regarding a life care plan, his expert opinion should be accepted by the trier of fact." There is no sound reason in this record for rejecting the *uncontradicted* testimony of every medical provider who testified. The majority, simply put, got it wrong.

I would find also the insurer's conduct to be arbitrary and capricious under La.R.S. 22:658 and 1220. Accordingly, I would award $5,000.00 in damages and $10,000.00 in attorney fees. I understand the $25,000.00 paid by State Farm was for medical expenses. However, its adjuster admitted that it would not pay this amount unless these expenses were causally related to the accident. Yet, nothing was offered to this injured person.

For the foregoing reasons, I dissent in part.

3